STATE of Missouri, Respondent,

v.

Lee Holden PARKER, Appellant.

No. 54295.

Supreme Court of Missouri,
Division No. 2.

Sept. 14, 1970.

Motions for Rehearing or to Transfer to
Court En Banc Denied Oct. 12, 1970.

John C. Danforth, Atty. Gen., Peter H. Ruger, Asst. Atty. Gen., Jefferson City, for respondent.

Lee Holden Parker, appellant, pro se.

William R. Kirby (Court Appointed), St. Louis, for appellant.

MORGAN, Judge.

Defendant was tried as a second offender for the crime of robbery first degree by means of a dangerous and deadly weapon. After the jury returned a verdict of guilty, the court assessed punishment at confinement for fifteen years. Sections 556.280, 560.120 and 560.135, RSMo 1959, V.A.M.S.

On the evening of July 11, 1967, Rita and George, a young couple then engaged, had been shopping and purchased some glassware. At approximately 9:45 P.M. they were sitting in a convertible automobile, with the top down, at a parking lot on 12th Street in St. Louis, Missouri, across from the residence apartment of Rita and her parents. As she testified: "A man came up to the car and held a knife to my throat, he said he needed the car * * *." The assailant then handed her a roll of tape, and, "He told us not to be loud, if we would do what he said he wouldn't hurt us, and then he told me to tape George's wrists * * * then he taped mine." He then requested instructions for raising the top, and after doing so, drove west on Interstate 70 to a point west of St. Charles. He drove into a field, had George get out, taped his feet and wrists together and left him on the ground. Then, "He took my money ($25 from her purse) and told me to get out and started to tape my feet and he ran out of tape, and then he got the string from my package." After he drove off, George was able to untie the tape and string, and they walked to a farm home and called the officials. There was further testimony that the assailant wore gloves, had the tape in a paper bag, said he was an escaped convict, had served seventeen years, "had to get out of town"; and that he "made a reference to having a gun on his waistband * * * I saw (the top) of what I thought was a holster." George's testimony was essentially the same, and $10 had been tak-

en from his wallet. The car was found two days later parked at the rear of a building about one and a half blocks from Dismas House where defendant lived.

Rita and George gave a description of their assailant to the police of St. Charles, but the primary issues now raised pertain to the activities of the two detectives assigned to the case by the metropolitan police department of St. Louis. The following day they accompanied the victims to the field and recovered some of the tape. During the next few days, on several occasions, they exhibited some fifty to two hundred photographs to Rita and George. Of the group, George had picked one that "resembled" defendant, but it was agreed to be of another person. An officer testified that on the morning of July 18, "We received information from a confidential informant that [defendant was] responsible for the offense." The two detectives, Allers and Lepping, went to defendant's place of employment where he was made available in an office of the employer. Defendant was placed under arrest, without a warrant, and searched. He had a pocket knife with a blade approximately two inches long. Defendant asked "to get his stuff out of his locker" and he took out a brown paper lunch bag which the officers checked. Therein, they found a black leather pipe holder. Defendant was taken to the police station, and the two officers then went to Dismas House. After obtaining a key from the manager, defendant's locker was searched and certain property was taken. However, the trial court sustained a motion to suppress the use of such items as evidence, and the propriety of the locker search is not at issue. On the same day, July 18, a photograph was taken of defendant (Exhibit C). This single picture was shown to the victims and identified as the assailant. Later they went to the police station to observe a "lineup" but none was had. Charges were filed and defendant was scheduled for arraignment on July 21. The officers had the victims accompany them to the courtroom where three or four groups of men (consisting of approx-imately ten each) were brought in for arraignment. Defendant was identified by the victims, and, as shown by the evidence, without any suggestive acts or comments by the officers.

At the trial both Rita and George positively identified defendant as their assailant. The defendant did not testify nor was any evidence offered on his behalf. Although he was represented by experienced and skilled counsel appointed by the court, upon his insistence, defendant acted as his own attorney through much of the trial.

The first point argued on appeal is that the in-court identification was "tainted" by (1) the showing of the single photograph and (2) the victims' observation of him as he appeared for arraignment. The state proceeded under the theory that the in-court identification had a basis independent of either the arraignment confrontation or single photograph. This conclusion was based, factually, on both victims being close to defendant for approximately one hour and a half. The first encounter was under the new fluorescent lights of the parking lot. In fact, defendant emphasized throughout cross-examination, that both had every opportunity to clearly see their assailant. The apparent purpose was to impress the jury with the fact neither had mentioned, nor perhaps even seen, a tatoo on one arm and a scar on the left side of his forehead. Neither officer had noticed the scar prior to trial where it was described as being "red."

■■ Of course, the most basic requirement of the trial of an accused is that he be shown to be that person who committed the offense. From the innumerable cases on "identification," it is obvious that the courts jealously guard against any chance of error. For this reason, even the approved investigative methods, be it confrontation or photographic comparison, may be found improper if "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377 at 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The court went on to say, loc. cit.

384, 88 S.Ct. 967, that each case must be considered on its own facts and evaluated in light of the totality of the surrounding circumstances. The rationale of such an approach necessarily demands consideration be given to (1) the presence of an independent basis of identification, (2) the absence of any suggestive influence by others, and (3) positive courtroom identification. The facts of this case show such criteria were met and satisfied. Certainly, the viewing of one photograph could be more suspect as presenting suggestive possibilities if the evidence were not so overwhelming on each of the other points. As was concluded in the Simmons case, the procedure followed may not have been ideal, but "in the factual surroundings of this case" the identification procedure used did not deny due process. State v. Reeder, Mo., 436 S.W.2d 629.

As to the later viewing of defendant at arraignment on July 21, the purpose of so doing is vitally important. Both officers testified on this point. On cross-examination, Allers said: "They had not seen him * * * They identified a photo." Lepping testified: "He had been identified through a picture * * * Positive picture identification * * *." The officers could have rested their efforts at this time; however, in what appears to have resulted from a commendable desire to see that any faint possibility of error was removed, they had the victims personally observe defendant at arraignment. Nothing suggestive was done at that time nor was it to "make a case" as defendant had already been positively identified. Such action was indicative of the officers' dedication to the task of protecting the innocent. The facts do not show the confrontation to be comparable to the usual lineup procedure. Furthermore, even if such an approach were condemned, we would have to declare, under the evidence in this case, that it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284, No. 750, June 2, 1969.

In his second point, defendant contends the leather pipe holder taken from his person was not admissible, because his arrest was illegal as was the resulting search, for the reasons (1) there was nothing on his person that endangered the officers or (2) were the fruits of the robbery. There is no merit in this argument. "It has long been the rule in this state, and many cases set it forth, that a peace officer may arrest without a warrant anyone who he has reasonable grounds to believe has committed a felony." State v. Berstein, Mo., 372 S.W.2d 57, 59. Vol. 4, Mo.Dig., Arrest, ☞63(4). The arresting officers knew of the commission of the felony, had a picture which was said to "resemble" defendant, and had by a reliable informant been advised defendant was the offender. Such facts gave reasonable cause for the arrest. Search of the person, incident thereto, was proper. State v. Wiley, Mo., 412 S.W.2d 485; Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The leather pipe holder was described as being "similar" to that worn by the assailant. Its use in evidence was not error. State v. Ray, Mo., 354 S.W.2d 840.

All of the possible discrepancies in the testimony of Rita and George with the descriptive information originally given were brought out at trial and were for the jury. For example, Rita had said the knife blade looked six inches long which would not be surprising. She had thought his hair dark black when it was described as dark brown at the trial. These, as well as other minor discrepancies, are not such as to place doubt on the jury's finding that defendant committed the offense.

As his last point, defendant claims the trial court erred in not "entering" its finding that he was a second offender as required by Section 556.280, RSMo 1959, V.A.M.S. That statutory provision provides, in part: "(2) Evidence of the prior conviction, sentence and subse-

quent imprisonment or fine, parole, or probation shall be heard and determined by the trial judge, out of the hearing of the jury prior to the submission of the case to the jury, and the court shall *enter its findings* thereon * * *." (Emphasis added.)

Clearly, the trial court was aware of the mandate of the statute. At the start of the hearing thereon, the court said: "I understand the next business of the State would be to prove the prior conviction. It is necessary we formally do it * * *." However, after proof was made, no further comment or entry was made. This is not a case calling for a determination of the sufficiency of the finding made, but the effect of no finding of record at all. The provision of the statute requires the trial court "enter its findings" and being mandatory can not be ignored.

It is required that "* * * the cause [be] reversed and remanded for the conduct of a hearing on the question of the applicability of the Second Offender Act and for a resentencing of the defendant or the granting of a new trial on all issues, depending on the court's finding on such hearing." State v. Vermillion, Mo., 446 S.W.2d 788, 790.

The judgment is reversed and remanded.

All of the Judges concur.