STATE of Missouri, Plaintiff-Respondent,

v.

Raymond Lewis MURPHY, Defendant-Appellant.

No. 9476.

Missouri Court of Appeals, Springfield District.

March 25, 1974.

Max W. Foust and Russell D. Jacobson, Morris, Foust, Moudy & Beckett, Kansas City, for defendant-appellant.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PAUL E. CARVER, Special Judge.

Raymond Lewis Murphy was found guilty by a jury in the Circuit Court of Greene County of burglary in the first degree under the provisions of § 560.040, RSMo 1969, V.A.M.S., and was by their verdict sentenced to imprisonment for a term of 10 years under the supervision and custody of the State Department of Corrections of the State of Missouri. From the judgment and sentencing resulting therefrom he has appealed to this court.

Defendant, prior to trial on the merits of his case, filed his "Motion to Suppress Identification Testimony", which is as follows:

"Comes now the above named defendant and respectfully moves the Court to suppress both the pre-trial and the trial identification of the defendant as the perpetrator of the crime charged in the Information in this cause and his grounds therefor are as follows:

"1. Defendant was first identified by witness by means of suggestive photographs which were so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

"2. The defendant was identified by the witness on the 10th day of February, 1972, at a pre-trial confrontation which was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

"3. That defendant was further identified by the witness in the company of law officers at a hospital in Cedar County, Missouri, which confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.

"4. The in-court trial identification of the witness does not have a source independent of the unconstitutional pretrial identification as set forth above, and therefore is not admissible at trial."

On October 5, 1972, the trial judge held a hearing on defendant's motion and heard evidence thereon. The following evidence was presented in support of defendant's motion.

Mrs. Anna Mitchell was called as a witness and testified that on October 7, 1971, she resided at Willard in Greene County, Missouri. That on that date she was not feeling well and had remained in bed. At about 8:45 a. m. the door bell rang several times, but being ill, she did not answer the door. After the door bell had stopped ringing, she went downstairs and discovered two men in her home, one of whom was kneeling to unplug a TV set and the other holding the set in his hands. She yelled at them and they ran from the house and down the driveway and escaped. This occurred during the daytime, and she stated that she saw one of the men face to face from about eight feet away and "practically in the same room"; and that the room had "plenty of illumination" and that her eyesight was good. Mrs. Mitchell identified this man as the defendant.

She gave the sheriff's deputies descriptions of both men and said she saw the face of the other man as well as that of defendant. She viewed photographs of various persons contained in "mug books" and also a number of loose photos which were brought out to her by the Greene County Sheriff's deputies to view. She said that she identified the other man from the "mug book" photos and a "couple of weeks" later she picked out defendant's photo from a group of 30 or 40 pictures; and she testified that none of the deputies did anything to suggest that the photo that she picked was the defendant.

Mrs. Mitchell testified that she was thereafter contacted by one of the Greene County Sheriff's deputies, and asked to accompany him on a trip, and she replied that she would do anything she could to help. The next day she and two deputy sheriffs (Detectives Jesse Craig and Ivan Johnson) drove to El Dorado Springs in Cedar County, but she stated that they didn't tell her where they were going. She testified that during this trip she did not ask any questions of the deputies about the purpose of the trip or talk about the crimi-

nal case, and was not asked any questions by them except for her identification to the officers of the defendant, Mr. Murphy, in the Cedar County Hospital.

After arriving at the hospital parking lot, she and the officers sat in the car until about noon, on what Mrs. Mitchell described as a "stake-out", and the officers asked her to keep her "eyes open". They then entered the hospital waiting room where she observed a number of people such as nurses, nurses' aides, doctors, and others. She walked out into a hospital hallway where she saw a man walk past her whom she identified to the deputies as one of the men she saw in her home on October 7th, and whom she further identified as the defendant here. She stated that although no one told her the purpose of the trip to El Dorado Springs, that she knew that she was there to "look for somebody".

Mrs. Mitchell stated that she had thereafter seen Mr. Murphy at the preliminary hearing and at this motion hearing, and that she had no question about her identification of the defendant.

The next witness was a former Cedar County deputy sheriff, Don F. Martin, who testified that he was with Mrs. Mitchell and the other deputies on the day they went to the Cedar County Hospital. He said that before she went to the hospital, she told him "about what happened at her home." He denied telling her why she was there and what she was to do. Mr. Martin also stated that he could "possibly" have told Mrs. Mitchell that he knew someone who more or less answered the description she had given and they wanted her to take a look at him to see if he was the man, and may have told her that there was someone at the hospital "that might be who she was looking for." He stated that he usually didn't prod witnesses. He denied pointing defendant out to Mrs. Mitchell. He further stated that when she picked him out, that there were several other people around (a doctor, the hospital administrator, a custodian, and perhaps another visitor).

Jesse Craig, a Greene County deputy, testified that he had received a description of the men she found in her home, and at a later date he came out on at least two occasions with a number of individual photos for her to view. He showed her six or eight photos on his second visit, including one that he said was of Mr. Murphy. He stated that he and Deputy Ivan Johnson took Mrs. Mitchell to the hospital on January 14, 1972, and while he didn't tell her that the trip was for the purpose of identifying someone who burglarized her home, that he assumed she knew this because it was the only business that they had with her. On arrival at El Dorado Springs, Mr. Craig told her that wherever they "went during the entire trip to keep her eyes open, observe everyone she seen, for the purpose of seeing, if she could see anyone whom she recognized." He testified that she did identify Mr. Murphy while they were in the hospital. He told her to stand in the corridor of the hospital near the main desk and observe while he and the other deputy stayed in the waiting room, and that she then saw and identified Raymond Lewis Murphy, the defendant. He said that there were other people around there during this time. In his further testimony as to the identification, Craig said that when he had shown her the photos, which he said included Mr. Murphy's picture, she stated that she "would like to see this man in person", which Craig indicated was not a sufficient identification for his purposes. Craig testified that after this occurred, he began working on arrangements for the trip to El Dorado Springs to allow her to see Mr. Murphy in person. He stated that he didn't try to suggest to pick out anyone when she looked at the photos, and didn't help her or try to point anyone out to her at the hospital.

The last witness on the motion was Deputy Ivan Johnson, who had gone out to Mrs. Mitchell's home on October 7th to in-

vestigate the occurrence, and took the description of the men from her. He stated that she described one man as tall and the other as looking like a Mexican. He testified that she made the statement about desiring to see the person in one of the photos brought by Mr. Craig for her to view, and that she would not identify him from the photo alone.

This matter was taken under advisement and on October 18, 1972, was denied by the trial judge.

At the trial Mrs. Mitchell testified that on October 7, 1971, about 8:45 in the morning, that she was awakened in the bedroom of her home by the door bell ringing; that she heard conversational tone voices in the family room of her home and went into the room, where she found two men at her color TV set; one man was holding the set and the other unplugging it. She identified the defendant, Mr. Murphy, as the man holding the TV; she saw him first from about 10 feet away, for a few seconds, face to face. She demanded to know what they were doing there, and both ran from the house. She unsuccessfully chased them, then called the sheriff's office to report the incident, and then found that the patio door screen had been cut and door jimmied.

She gave the sheriff's deputies descriptions of the two men. She said that the men "appeared to be speaking some other language, maybe Mexican."

Thereafter, the sheriff's deputies brought by "mug books" containing a number of photos of individuals, for her to view in order to try and identify the men, and she found a photograph which she identified as depicting one of them, but not this defendant. Later (she estimated about October 10th or 14th of 1971) the deputies brought out some more photos, one of which she said was defendant's picture.

Following this, on January 14, 1972, she and two deputies journeyed to El Dorado Springs, where she identified the defendant at the hospital. She stated that she recognized him when she was 100 or 150 feet away and that defendant walked by her; and then when she first saw him there, that there were several other people around him, including several men. Her testimony was that no one told where she was going or why she was going and that she and the deputies didn't talk about the case during the trip. She was told to keep her "eyes open", and that she understood (from her common sense) that she was to look and see anyone that she had seen before, and that the man they wanted her to look at was at the hospital. She said that she didn't wear glasses.

Deputy Craig then testified that Mrs. Mitchell had picked out a photo of the defendant and made the statement that she would like to see the man in person, and that this was the reason that the deputies took her to El Dorado Springs. He stated that he didn't tell Mrs. Mitchell anything other than he didn't know what would transpire that day and for her to "keep her eyes open and observe every person she saw."

The defendant, Mr. Murphy, testified on his own behalf, stating that he had never seen Mrs. Mitchell before his arrest; had been in Springfield on the night before the burglary.

From the verdict of the jury, which was accepted by the court, the defendant filed a motion for a new trial. The motion for a new trial was denied by the trial court. Allocution was granted the defendant, and no reason being shown or given, the court denied defendant's "Motion to Reduce Sentence", by assessing a sentence of 10 years under the custody of the Department of Corrections.

Thereafter, notice of appeal was filed by the defendant, and said cause was duly transferred to this court.

Upon appeal no complaint was made of the sufficiency of the evidence or of any other error except the following:

"I. The trial court erred in overruling defendant's Motion to Suppress the identi-

fication testimony because under the totality of the surrounding circumstances the identification was improperly suggestive in that the alleged photographic identification was inconclusive, and, thereafter, that a confrontation was arranged by the Sheriff's deputies that improperly suggested that defendant was the guilty party."

"II. The trial court erred in refusing to give defendant's Instruction 'B' because such action had the effect of depriving defendant of his defense of improper identification in that without said instruction the jury was not given the necessary criteria or guidelines by which to judge the circumstances surrounding the identification."

We shall determine defendant's assignment of error.

On assignment of error I, the defendant complains:

"The trial court erred in overruling defendant's Motion to Suppress the identification testimony because under the totality of the surrounding circumstances the identification was improperly suggestive in that the alleged photographic identification was inconclusive, and, thereafter, that a confrontation was arranged by the Sheriff's deputies that improperly suggested that defendant was the guilty party."

Defendant insists that his Motion to Suppress should have been sustained because under the "totality of the surrounding circumstances" the identification was improperly suggestive and tainted.

Defendant further contends that this violated the due process test laid down in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); and State v. Parker, 458 S.W.2d 241 (Mo.1970).

■ The rule in Missouri as to the determination whether an identification of a person in a lineup situation is "impermissibly suggestive" is declared to be as follows.

Each case must be considered on its own facts but consideration should be given to "(1) the presence of an independent basis of identification, (2) the absence of any suggestive influence by others, and (3) positive courtroom identification." State v. Parker, supra, 458 S.W.2d at 244. See State v. Boothe, 485 S.W.2d 11, 13 [1, 2] (Mo. banc 1972); State v. Tidwell, 500 S.W.2d 329, 331 [3–5] (Mo.App.1973).

■■ As has been said in many cases, and which courts recognize as the primary requirement in the trial of a person charged with a crime, the person accused must be shown to be the person who committed the offense. The identification of the accused should not be done in such a way in that so doing it is " 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " State v. Parker, supra, 458 S.W.2d at 243 [1–2].

■ Our search of the record does not disclose evidence that makes the identification of the defendant "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." In fact the record is clear of any evidence that Mrs. Mitchell's identification was influenced by any person. She identified the defendant without any help from the sheriff's deputies, and her in-court identification of the defendant was positive.

The facts of this case show without doubt that the criteria of *Stovall, Simmons, Boothe* and *Parker* were not violated and that the defendant was the person who burglarized Mrs. Mitchell's home. Defendant's first assignment of error is denied.

We have on our own volition examined the sufficiency of the evidence to support defendant's conviction, and determine that there was sufficient evidence to support his conviction.

■ Where there is positive identification by a single eyewitness, with explana-

tion as to discrepancies, this constitutes substantial evidence of the guilt of the defendant, and the weight of the evidence is for the jury. This is especially so where the lighting is good and the witness was close to and personally saw the face of the burglar, and in a face to face burglary, even though the time of confrontation was short. State v. Cline, 452 S.W.2d 190, 193 [4] (Mo.1970); State v. Young, 345 Mo. 407, 411, 133 S.W.2d 404, 407 [7, 8, 9] (1939); State v. Carson, 501 S.W.2d 503, 506 [1] (Mo.App.1973).

■ Robbery convictions have been upheld where the evidence was identical on the matter of identification and where the proof was no more positive than here. State v. Ross, 502 S.W.2d 241, 245–246 [1, 2] (Mo.1973); State v. Cannon, 486 S.W. 2d 212, 214 [3] (Mo.1972); State v. Bibee, 496 S.W.2d 305, 316 [23] (Mo.App.1973). In addition to the above identification the evidence discloses that there was a forcible breaking of the outer screen door and the inner door to the dwelling house and that at the time of the breaking and entering there was a human being present in the dwelling house. A positive identification of the defendant was made by Mrs. Mitchell in the trial court. Such evidence is sufficient to support a verdict of guilty of burglary in the first degree. § 560.040, RSMo1969, V.A.M.S.; State v. Edwards, 353 S.W.2d 725, 727 [4] (Mo.1962). The evidence presented by the State was substantial and sufficient to support the verdict of guilty found by the jury.

By assignment of error II, the defendant complains in his brief that:

"The trial court erred in refusing to give defendant's Instruction 'B' because such action had the effect of depriving defendant of his defense of improper identification in that without said instruction the jury was not given the necessary criteria or guidelines by which to judge the circumstances surrounding the identification."

The trial court gave Instruction No. 5 requested by the defendant on the issue of identification, which is as follows:

"The Court instructs the jury that where the prosecution has offered identification testimony, that is, the testimony of an eyewitness that she saw the defendant commit the act charged, such testimony should be received with caution. An identification by a stranger is not as trustworthy as an identification by an acquaintance. Mistaken identification is not uncommon. The witness' opportunity to observe the perpetrator during the commission of the act charged is of great importance in determining the credibility of his identification. The testimony of the witness that she is positive of her identification may be considered by you, but does not relieve you of the duty to carefully consider her identification testimony and to reject it if you find that it is not reliable. Careful scrutiny of such testimony is especially important, when, as in this case, it is the only testimony offered by the prosecution to connect the defendant with the act charged."

The defendant offered Instruction B on the issue of identification also, which is as follows:

"The court instructs the jury that an identification procedure is any confrontation between the defendant and a witness, arranged by the authorities before trial, for the purpose of obtaining an identification. Where evidence has been introduced that a witness, who has identified the defendant at trial, identified him on some occasion before trial, the circumstances of that identification procedure may be considered by you in determining the reliability of the witness' identification.

"Dangers of suggestion, i. e., circumstances which draw attention to a particular person, exist in any identification procedure. The suggestion may be so great that the witness identified someone, before trial, who is not in fact the person who

committed the act charged. It is a matter of common knowledge, however, that once a witness has identified someone prior to trial, he is not likely to change his testimony at the trial. In determining the credibility of the witness' identification, therefore, you may consider whether the identification procedure contained any elements of suggestion which would have a tendency in reason to affect the reliability of the identification, including but not limited to the following: (1) whether the witness saw the defendant in a group or alone; (2) whether the other members of the group were grossly dissimilar in appearance from the defendant; (3) whether the witness, prior to the confrontation, was told that the person, or one of the persons, the witness was about to see was the guilty party; (4) and whether the defendant was pointed out before or during the confrontation."

The trial judge refused to give Instructions A and B. The defendant made no objection in the trial court to the refusal of the giving of these instructions. In his motion for a new trial he did object to Instructions A and B as follows.

█ "The Court erred in refusing defendant's offered instructions A & B for the reason that same properly stated the law under the evidence in this cause and refusal to give same deprived defendant of his defense." This assignment is too general to present anything for appellate court review. Rule 27.20(a), V.A.M.R.; State v. Jordan, 235 S.W.2d 379, 383 [8] (Mo. 1951).

Defendant's complaint of the trial judge's failure to give Instruction A is not preserved in his brief. We will not consider it. Rule 28.02, V.A.M.R.

█ Defendant complains in the argument of his brief that the trial judge erred in giving Instruction No. 5 in that "it does not, by itself, advise the jury of the specific criteria for a proper evaluation of such evidence, for example, the issue of sugges-

tion (and criteria for considering such an issue) are set forth in 'B', but not mentioned in No. 5. Under the authorities cited in Point I, State v. Parker and Simmons v. United States, supra, such criteria are vital to the accused's defense, and the court's refusal to so instruct, under the 'totality of circumstances', prevents the jury from considering this defense." Defendant's abstract statement of law, without showing how it is related to the ruling of the trial court, is not sufficient to preserve for review this assignment of error. Rule 84.04(d), V.A.M.R. The points relied on by the defendant on his appeal should definately isolate and formulate the precise issue to be reviewed and not be relegated to the argument portion of the brief. State v. Freeman, 489 S.W.2d 749, 752 [1, 2] (Mo.App.1973).

█ Instruction B, which was offered, is a cautionary instruction. Cautionary instructions with regard to identification, however, are within the discretion of the trial court. State v. Taylor, 472 S.W.2d 395, 402 [3–4] (Mo.1971); State v. Bibbs, 461 S.W.2d 755, 760 [7] (Mo.1970). There is nothing in the present case to indicate the refusal to give the requested instruction was an abuse of discretion. The court did give a cautionary instruction on the issue of identification in defendant's Instruction No. 5, which was given by the trial judge at the request of the defendant. Defendant does not claim that this instruction was erroneous.

Defendant's assignment of error II is denied.

A careful consideration of the entire record convinces us that the defendant's assertions of error lack merit. Defendant in all respects had a fair trial, and the evidence supports his conviction, and the trial judge was correct in denying the motion for new trial.

The matters for which no assignment of error is required have been examined, as required by Rules 28.02 and 28.08. The in-

formation is sufficient and in proper form. The defendant stood trial upon his plea of not guilty. The jury's verdict is in proper form and responsive to the issues. The punishment assessed was within the range provided by statute. Defendant's motion for a new trial was considered by the trial judge and denied. Allocution was granted. Defendant had the benefit of competent counsel throughout his trial and upon his appeal. No error appearing from the record, the judgment is affirmed.

All concur except HOGAN, C. J., not sitting.