**STATE of Missouri, Respondent,**

v.

**Eddie GREER, Appellant.**

**No. WD 31117.**

Missouri Court of Appeals,
Western District.

Nov. 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 2, 1980.

Application to Transfer Denied Jan. 13, 1981.

Clifford A. Cohen, Public Defender, Gary L. Gardner, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Earl W. Brown, III, Philip M. Koppe, Asst. Attys. Gen., Kansas City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is a direct appeal from convictions for two counts of kidnapping, two counts of rape, two counts of sodomy and two counts of armed criminal action. The jury assessed punishment of six hundred twenty years imprisonment. The judgment is reversed in part and affirmed in part.

Appellant presents three points of error, which in summary allege (1) the trial court erred in failing to dismiss the two counts of armed criminal action because said counts placed appellant in double jeopardy; (2) the trial court erred in compelling appellant to be fingerprinted because, although requested, appellant received no evidentiary hearing pursuant to Rule 25.35; and (3) the trial court erred in admitting both the out–of–court and in-court identification of appellant because the identification was the result of impermissible suggestion by hypnosis, and apart from any suggestiveness, identification premised upon hypnosis is inherently unreliable and violates appellant's rights to constitutional due process.

On November 1, 1977, at about 7:30 p. m., two teenage girls drove to a local record shop in Kansas City, Missouri. They were in the record shop for about 15 minutes and departed early because while inside, they noticed a black male staring at them. The girls rushed to their stationwagon, which was parked and locked on a side street. As the one girl (driver) was unlocking the stationwagon and opening the right front door for the other girl, a white automobile with four or five black males inside backed up alongside the stationwagon. A voice from inside the white automobile asked the girls, "How are you doing tonight?" The girls did not respond. As the girls got into the stationwagon, appellant, with a gun, forced his way into the stationwagon on the passenger side. Appellant pointed the gun at the girls and made them drive through an alley where another black male was located. This second man knocked on the window of the stationwagon and entered the stationwagon. At this point, the girls were forced

to move to the rear seat with appellant. Appellant ordered the girls at gunpoint to lay their heads on his lap. The other black male drove the stationwagon. While they were riding and in this position, appellant ordered one of the girls to unzip her pants and appellant placed his hand inside her pants.

After a ride lasting approximately 10–15 minutes, the girls were taken inside a house. Appellant and the other black male were joined in the house by three or four more black males. At gunpoint, the girls were ordered to disrobe. They were told if they did not disrobe, they would be shot or killed. After they removed their clothing, the girls were subjected to multiple and simultaneous acts of vaginal, oral and anal sexual assault by appellant and the other four or five black males in the house. The girls were then ordered to dress, and after doing so, were told to undress, and repeated sexual assaults again occurred. After the second assaults, the girls were taken back to their stationwagon by appellant and another black male. They were ordered to lay on the back seat and from that position, neither girl could observe their location. The time at this point was approximately 11:00 p. m. as the radio was on in the stationwagon and the hour was announced. After driving a short period of time, appellant and the other black male abandoned the girls in the stationwagon. The girls lay on the back seat for about 45 minutes, as appellant had told them to do, because he was going to talk to someone and would return in about 20 minutes. When the girls realized the two black males were gone, they jumped in the front seat and drove the stationwagon away. While driving away, the girls became involved in a collision with another vehicle. They asked the driver of the other vehicle to take them to the hospital. This other driver took the girls to Menorah Hospital. At the hospital, the girls met with a policeman, who transported them to St. Luke's Hospital. At approximately 1:00 a. m., a medical examination was performed on both girls. The medical examination revealed seminal fluid with live sperm in both of the girls and the fact that sexual intercourse had occurred.

While at St. Luke's Hospital, the girls described their abductor as a negro male about 30 years of age, five foot six, 150 pounds, of stocky build with a mustache and afro hairdo of medium length. They said he was wearing a black hat and white coat and was armed with a silver–colored handgun.

An investigation was launched, which resulted in an indictment charging appellant with kidnapping, rape, sodomy and armed criminal action. Numerous pretrial motions were filed and hearings held thereon. Appellant presented an alibi defense. The jury entered its verdict and following the overruling of appellant's motion for new trial, this appeal followed.

Turning to appellant's point one, this court is required to determine whether or not appellant was placed in double jeopardy by being charged with kidnapping (two counts because there were two victims). by and through the use, aid and assistance of a dangerous and deadly weapon; and by the use, aid and assistance thereof, he was charged with two counts of armed criminal action.

Appellant was charged with kidnapping in violation of § 559.240, RSMo 1969, the pertinent part of which reads:

"559.240. *Kidnapping.*–1. If any person shall, willfully and without lawful authority, forcibly seize, confine, inveigle, decoy or kidnap any person, with intent to cause such person to be sent or taken out of this state, or to be secretly confined within the same against his will, or shall forcibly carry or send such person out of this state against his will, he shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding ten years."

Because appellant kidnapped the two girls at gunpoint, he was charged with two counts of armed criminal action in conjunction therewith. These two counts were premised upon violation of § 559.225 RSMo Supp. 1976, which reads:

"*559.225. Armed criminal action–penalty–exceptions.*–1. Except as provided in subsection 4 of this section, any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous or deadly weapon is also guilty of the crime of armed criminal action and, upon conviction, shall be punished by imprisonment by the division of corrections for a term of not less than three years. The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of a dangerous or deadly weapon. No person convicted under this subsection shall be eligible for parole, probation, conditional release or suspended imposition or execution of sentence for a period of three calendar years.

2. Any person convicted of a second offense of armed criminal action shall be punished by imprisonment by the division of corrections for a term of not less than five years. The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committee [sic] by, with, or through the use, assistance, or aid of a dangerous or deadly weapon. No person convicted under this subsection shall be eligible for parole, probation, conditional release or suspended imposition or execution of sentence for a period of five calendar years.

3. Any person convicted of a third or subsequent offense of armed criminal action shall be punished by imprisonment by the division of corrections for a term of not less than ten years. The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with, or through the use, assistance, or aid of a dangerous or deadly weapon. No person convicted under this subsection shall be eligible for parole, probation, conditional release or suspended imposition or execution of sentence for a period of ten calendar years.

4. The provisions of this section shall not apply to the felonies defined in sections 559.005, 564.590, 564.610, 564.620, 564.630, and 564.640, RSMo."

The issue of double jeopardy arises, of course, from and as a result of the decision by our State Supreme Court in *Sours v. State*, 593 S.W.2d 208 (Mo.banc 1980). It is not necessary to reiterate the details of *Sours*, but it suffices to state that the conviction of Sours for robbery, first degree and armed criminal action was held to have subjected Sours to conviction and punishment twice for the same offense, thereby placing Sours in double jeopardy and violating his constitutional rights.

Following the vacating of *Sours* by the United States Supreme Court in light of *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), and a remand to our State Supreme Court (see *Missouri v. Sours*, 593 S.W.2d 208 (1980), a second opinion was issued by our State Supreme Court which resulted in the reinstatement and supplement of its original opinion, see *Sours v. State*, 603 S.W.2d 592 (Mo.banc 1980).

Reduced to its simplest form, the entirety of this issue rests upon the answer to the following questions: Does *Sours* prohibit punishment for armed criminal action and an "underlying felony" when such felony is robbery in the first degree *only*? or Does *Sours* mandate a broader application which results in the prohibition of punishment for armed criminal action in conjunction with any "underlying felony" upon which the armed criminal action is based?

Our State Supreme Court, in the original *Sours* decision, concluded that robbery, first degree and armed criminal action are the same offense regarding double jeopardy and that punishment for both, whether occurring in a single proceeding or successive proceedings is prohibited. Our State Supreme Court took from and applied the "same offense test" expressed in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The court, in *Blockburger*, declared at 304, 52 S.Ct. at 182:

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

In *Sours*, our State Supreme Court concluded that § 559.225 does more than enhance the punishment for the underlying felony. Rather, the court concluded that the statute required two sentences for two crimes (i. e., robbery, first degree and armed criminal action). Our State Supreme Court concluded that armed criminal action and the underlying felony constituted only one offense and not two, and in applying the "same offense test" from *Blockburger*, further and finally concluded that "conviction for both robbery first degree and armed criminal action places a defendant twice in jeopardy by multiplying the punishment for one offense," *Sours*, 593 S.W.2d at 222.

The United States Supreme Court then handed down its decision in *Whalen v. United States, supra*. *Whalen* reversed a conviction for rape and felony murder (the murder having been committed in perpetration of the rape). The United States Supreme Court concluded the rape and the felony murder were the "same offense", applying *Blockburger*, and declaring, "proof of rape is a necessary element of proof of the felony murder". *Whalen* 100 S.Ct. at 1439. The United States Supreme Court then vacated *Sours* in light of the *Whalen* decision and *Sours* was remanded for reconsideration by our State Supreme Court.

Upon remand, our State Supreme Court interpreted *Whalen* in a very narrow context. In the second *Sours* decision, our State Supreme Court held that *Whalen* failed to answer the question of whether legislative intent regarding imposition of multiple punishments for the same offense violated the prohibition against double jeopardy. Our State Supreme Court construed *Whalen* as having only reached the question of whether or not, by statute, the legislature intended multiple punishment for the same offense. Our Supreme Court found

that the United States Supreme Court concluded in *Whalen* that the legislature did not intend multiple punishments for the same offense, but that *Whalen* did not address or provide any direction relative to the constitutional question of double jeopardy. From this conclusion, our State Supreme Court felt obligated to again look at § 559.225 with regard to the legislative intent therein and without any direction or guidance from *Whalen*.

In its second consideration of *Sours*, our State Supreme Court applied the "same offense test" in *Blockburger* and concluded that the language of the armed criminal action statute, § 559.225, and the statute defining the underlying felony (robbery first degree) "plainly" do not "require proof of a fact which the other does not ..." *Sours v. State*, 603 S.W.2d 592, 598 (Mo. banc 1980).

*Whalen* declared that the court should presume that cumulative punishments were not intended by the legislature where the same offense is involved, unless a contrary intent exists. In *Sours*, our State Supreme Court found that the Missouri legislature did intend to authorize conviction and punishment for both armed criminal action and the underlying felony. Having reached that point, our State Supreme Court proceeded to decide the proposed constitutional issue of double jeopardy. This conclusion departs from *Whalen*, for in *Whalen*, the court had not found such legislative intent.

In its second *Sours* decision, our State Supreme Court adopted its analysis from its first *Sours* decision and held thusly, at p. 603 of its opinion:

"The double jeopardy clause of the fifth amendment to the United States Constitution prohibits the state from punishing a person twice for the same offense ... (citations omitted) ... Armed criminal action and the underlying felony used to prove armed criminal action–in this case, robbery first degree–are the same offense for double jeopardy purposes under the same evidence test, because it is not the case that proof of robbery requires proof of any fact not

also required to prove armed criminal action ... (citations omitted) ... Therefore, the double jeopardy clause prohibits separately punishing a person both for armed criminal action and for the underlying felony."

The result in the second *Sours* decision was the vacating of appellant's conviction for armed criminal action and the reinstatement of the original *Sours* decision as supplemented.

The instant proceedings require this court to interpret *Sours* and to determine the extent of its applicability regarding felonies other than the felony of robbery, first degree, hence the question above as to whether or not, for purposes of double jeopardy, punishment for armed criminal action is restricted to robbery, first degree. The instant proceedings also require this court to determine whether or not *Sours* mandates a broader application, resulting in the prohibition of punishment for armed criminal action in conjunction with any "underlying felony" upon which the armed criminal action is based.

 This court is bound to follow the mandate of our State Supreme Court. This court concludes that the prohibition mandated in *Sours* applies to all underlying felonies and is not limited or restricted to the felony of robbery, first degree. This conclusion is reached for the following reasons and upon the following analyses.

In the first instance, our State Supreme Court, in both *Sours'* opinions, speaks in general terms about armed criminal action and the "underlying felony". Both opinions only occasionally specify the particular felony involved, to wit, robbery in the first degree. In substance, both opinions, in speaking of the "underlying felony" do not limit the effect of the opinions to robbery, first degree. For example, in the first *Sours* opinion, the court declared:

"We find that armed criminal action and the underlying felony, in this case robbery first degree are the 'same offense' for double jeopardy purposes."
*Sours*, 593 S.W.2d at 210

In its second decision, at pp. 597, 598, 599 and 604 of the opinion, the State Supreme Court stated:

"Applying *Blockburger* as a rule of statutory construction to the armed criminal action statute and the statute defining *the underlying offense, in this case robbery first degree statute* ... § 559.225 ... plainly authorizes punishment both for armed criminal action and *for the underlying felony* ... Therefore, the double jeopardy clause prohibits separately punishing a person both for armed criminal action and *for the underlying felony*." (emphasis added)

In addition, if the "same offense test" in *Blockburger* were applied as it was in *Sours*, the result reached would be the same, whether applied in those cases where the underlying felony is robbery, first degree, or as in the instant case, the underlying felony is kidnapping, or to any case involving any specific underlying felony and armed criminal action arising out of that felony. Further, *Sours* has held that the offense of armed criminal action, by definition, includes the underlying felony, in turn defining the underlying felony as a lesser and included offense. Still further, *Sours* mandates, for the purposes of double jeopardy, that a greater offense is the "same" offense. This was expressed in *Sours* as follows:

"The crime of armed criminal action consists of two features: (1) any felony, and (2) the use of a dangerous and deadly weapon in the commission of (1). The first feature may be any one of a class of offenses, each of which consists in turn of several elements. If (1) specified a single felony, it would be obvious that armed criminal action includes all of the elements of the felony specified ... the result is no different where the statute refers to 'any felony'. Proof of armed criminal action still 'cannot be had without' proof of the underlying offense. *Harris* stands for the proposition that when a statute defines a crime as 'any felony' plus other elements, proof of the particular felony involved is required to prove that crime ... Thus ... armed

criminal action and the underlying felony constitutes only one offense and not two." *Sours*, 593 S.W.2d at 219 220

In its *Sours* decision, our State Supreme Court mandated that § 559.225 be construed as if the sentence, "The punishment imposed pursuant to this subsection shall be in addition to any punishment provided by law for the crime committed by, with or through the use, assistance or aid of a dangerous or deadly weapon," were in fact stricken from each subsection of § 559.225.

In applying the foregoing analysis of *Sours*, this court concludes that the prohibition premised upon double jeopardy is not limited or restricted to the felony of robbery, first degree, but applies to any underlying felony. For and upon the foregoing reasons, point one raised by appellant is sustained and the convictions are reversed. The sentences affixed pursuant thereto are held to be void.

In point two raised by appellant, the record reveals that during the pretrial hearings on appellant's motions to suppress, respondent filed a motion to compel the taking of appellant's finger and palm prints pursuant to Rule 25.35.[1] Prior to the filing of the written formal motion, respondent, in the presence of appellant's counsel, informed the court that the motion was being filed to avoid transporting a former police officer who, at the time of trial, was a resident of California. This police officer had previously taken appellant's fingerprints while an officer in the State of Illinois. At this juncture, appellant's counsel responded, "I will ... I would anticipate the hearing on that motion would be less than 10 minutes."

The written motion was filed when the court reconvened. Respondent explained to the court the great expense involved in bringing the former police officer from California. Respondent also explained that since appellant was fingerprinted in Illinois as a result of another criminal charge, the production of the prints obtained in Illinois might suggest to the jury appellant's involvement in other criminal activities.

Appellant opposed the motion, stating it was his understanding that Rule 25.35 required a hearing with production of evidence. Appellant further claimed the state was required to show why prints were necessary and what difficulties would be encountered by offering the prints, as they were possessed by respondent. Respondent had the master card of the prints taken in Illinois. Appellant further argued that prints need not be taken because respondent had the master card, that the situation should have been apparent to respondent prior to the day before trial and that the prints could be introduced by use of the master card in such manner as to devoid reference to appellant's involvement in other criminal activity.

After listening to counsel for respondent and appellant, the trial court entered the following order:

"Now on the 4th day of June, 1979, plaintiff presenting to this court good cause, the Court orders that the inked impressions requested in the State's Motion to Compel the Taking of Defendant's Fingerprints and Palmprints, be taken from Defendant Eddie L. Greer in a manner agreed on by the State and Defendant."

Appellant claims that Rule 25.35 (now 25.06), particularly subsections (C) and (D) were not complied with. The pertinent portions of this rule are:

"(B) Upon motion by the state, and subject to constitutional limitations and any other safeguards deemed appropriate by the court, and upon a showing of good cause, the court may order the defendant to: ... (3) Be fingerprinted ...

(C) If requested by any party, the court shall hear evidence on the necessity of discovery requested under Rule 25.-06(B).

(D) In its order directing discovery under this Rule, the court shall make the grounds for its decision on a part of the record."

---

1. Now Rule 25.06(C).

Rule 25.35, predecessor to Rule 25.06, became effective on July 1, 1974 and since its inception, no case has construed the rule.

When appellant was advised the motion was going to be filed, appellant did not anticipate any lengthy consideration of the motion. The record, when viewed in total, reveals that appellant had no real objection to it and in fact argued the master card from Illinois could be introduced in such a manner as to avoid alerting the jury that he was involved in other criminal activity.

■ Respondent pointed out to the trial court that one of the main reasons for requesting appellant's fingerprints, and hence discarding the use of the Illinois master card, was to safeguard appellant. Appellant cannot be heard to complain upon alleged noncompliance of the rule on that basis because, as a result of the request and the subsequent order by the trial court, he was afforded greater protection of his rights to a fair trial. Further, if the state were to have offered evidence upon the reasons for the fingerprints, the motion would have been granted. Conversely, if the state were unable to produce evidence upon the motion, the prints via the Illinois master card would have been produced. The result of the trial court's action was to protect appellant from potential prejudice which might have arisen if the Illinois master card had been produced, indicating other criminal behavior. The bare assertion of no evidentiary hearing, contrasted with the facts and circumstances of the instant case, shows this argument to be without merit.

■ Appellant also argues that the court did not state grounds for its decision as required by the rule (see Rule 25.35[D] above). That portion of appellant's argument fails for two reasons. The order declares that respondent presented to the trial court "good cause" in support of the motion. It must be pointed out that the order followed argument by both parties wherein the reasons (i. e., transport of a former police officer and the possible prejudice to appellant by use of the Illinois master card) had been presented. These factors and review of the entire record upon this point do

not lead to the conclusion that the trial court's failure to further specify the reasons for its order is tantamount to noncompliance with the rule. In addition, no objection to the trial court's order was raised at trial and such issue is first raised upon this appeal. No mention or challenge of the order as violative of Rule 25.35(D) was made in appellant's motion for new trial. Nothing on this point was preserved for review, see Rule 29.11(d) (formerly rule 27.-20); *State v. Martin*, 451 S.W.2d 96 (Mo. 1970) and *State v. Holmes*, 439 S.W.2d 518 (Mo.1969).

For the foregoing reasons, point two is ruled against appellant.

Disposition of appellant's final alleged error necessitates interrelated consideration of appellant's pretrial motion to suppress evidence and the evidence developed upon trial. Appellant argues that identification of appellant was not admissible because such identification was the result of impermissibly suggestive hypnosis and, even if there were no impermissive suggestions, the process of identification resulting from hypnosis was inherently unreliable.

Our courts have spoken to the issue of impermissible suggestive identification. The latest authority presenting the analysis to be applied is *State v. Higgins*, 592 S.W.2d 151 (Mo.banc 1979). *Higgins* involved pretrial identification by use and the viewing of photographs. Our State Supreme Court held at 592 S.W.2d at 159 the danger to be guarded against is any procedure "so impermissibly suggestive as to give rise to a very substantial likelihood of *irreparable misidentification*". (emphasis added)

In determining whether such a danger exists, our courts must look to the totality of the surrounding circumstances, see *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967) and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1966). In weighing the matter, two questions arise and were present in the *Higgins* case. These are: Were the investigative procedures employed by the police impermissibly suggestive? If so,

were they so impermissibly suggestive as to create a very substantial likelihood of an irreparable misidentification at trial? See *Higgins, supra*, at 159.

It has been held that even if the procedures were impermissibly suggestive, identification testimony may nevertheless be admissible if it is reliable. The necessary reliability is to be determined from the "totality of the circumstances". Those factors to be considered in determining reliability are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation". *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself," see *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

The victims in the instant case were kidnapped, raped and sodomized the night of November 1, 1977. These events occurred between 7:00 p. m. and 11:00 p. m. While at the hospital, late the same evening and into the early morning hours of the next day, the victims provided a police detective with a description of the suspect who had kidnapped them at gun point and who had participated in the subsequent offenses. They described a "Negro male about 30 years old, five foot six, 150 pounds, stocky build, wearing a black hat, armed with an unknown type handgun, silver color, reported to have a mustache, medium length afro hairdo and wearing a white coat."

On November 4, 1977, in separate sessions, the victims were hypnotized by Dr. Marshall Saper, a local psychologist. Dr. Saper testified that he had training in the use of hypnosis and had used hypnosis periodically in his therapy work and in police cases (in his capacity as a reserve police officer). The hypnosis sessions were attended by two police officers, but neither participated in the sessions other than to observe. Dr. Saper testified the hypnosis was done to improve the victims' recollection, and stated that once a state of relaxation and concentration is achieved, the person is taken back in time to the incident in question and asked to describe what they see and hear. The person in such a state is fully awake and conscious of his or her surroundings.

Dr. Saper testified that the victims in the instant case achieved this conscious state of hypnosis. Dr. Saper admitted that once under hypnosis, a subject is open to suggestions. Dr. Saper then testified that "once the subjects were under hypnosis, no suggestion was given to them of any kind by me. The only suggestions given were to get them into hypnosis and that involved suggestions to relax, to imagine a feeling of warmth, to imagine a feeling of relaxation." Dr. Saper stated that prior to the hypnosis session, he did not know what the initial interrogation by police officers had revealed. He did testify, however, that following the session, a detective did tell him that the police had come up with more information than they had prior to the session.

One of the detectives attending the hypnosis session testified that both victims gave the description that their abductor was ". . . around 30, heavy build, but wasn't fat . . . something very strange about his eyes, almost Oriental or Egyptian . . . he had very slight fingers and wore no jewelry . . . he wore a black hat."

Subsequent to the hypnotic sessions, a police artist made a composite drawing from the description provided by one of the victims. This composite was made while the victim was not under hypnosis. This officer testified that the description given for the composite was the same given by this victim during the hypnosis session which he attended. He was the second officer during the hypnosis session.

On November 18 or 19, 1977, the victims were shown an array of photographs, appellant's photo was not among this array, and no identification was made. On November 22, 1977, another array of photographs (13

altogether) was shown to the victims. The photographs were an admixture of color and black/white photographs. Of the 13, a total of four were of the appellant. The victims were separated, the photographs shuffled and handed to the victims. Independently, the victims identified appellant and two others. One victim's identification was positive. The trial revealed the other victim stated she would have to hear appellant's voice to be completely certain. The record shows this second victim did identify appellant's voice when appellant made a spontaneous outburst during trial.

On December 29, 1977, the victims, accompanied by a female police officer and a female assistant prosecutor, traveled to Murphysboro, Illinois, where appellant was in the custody of Illinois authorities. The victims observed appellant, separately, through the window in a courtroom door. Appellant was inside the courtroom with seven other black males. Each victim was asked to view the men inside and then independently mark on a piece of paper the person they could identify, if anyone. Independently, and without suggestion from authorities or as a result of any conference between them, the victims identified appellant. One victim made a positive identification and the other victim made a tentative identification. The tentative identification was made subject to the second victim hearing appellant's voice as referred to above.

The foregoing evidence was before the trial court on appellant's motion to suppress. The motion was overruled.

Trial commenced and both victims testified appellant did not attempt to conceal his face; that they saw his face as he forced his way into their stationwagon and at the house where the assaults were committed upon them. They were questioned about their being blindfolded and both testified they were not blindfolded until after they were ordered to disrobe. One victim testified to being able to see through the sweater which was used as the blindfold on her. Both victims made positive identification of appellant in the courtroom. The second victim became positive in her identification after hearing appellant's voice during an outburst by appellant during trial. Both victims testified to being able to identify appellant from the photographs and the lineup.

In resolving appellant's point three, this court must answer four questions which arise as a result of appellant's argument. First, was the hypnosis impermissibly suggestive and as an adjunct thereof, does hypnosis render identification inherently unreliable? Second, was the lineup impermissibly suggestive? Third, was the photographic display impermissibly suggestive? Fourth, disregarding suggestiveness, were the identifications reliable?

Regarding question (1) above, appellant argues that hypnosis is "inherently susceptible to the process of suggestion and to the misperception of reality". He further argues that in the instant case, the hypnosis was "impermissibly suggestive because the girls' prehypnosis description was not lacking in detail." In his argument, appellant states "the hypnotic sessions . . . did not reveal any description significantly different or more detailed" than what was given prior to the hypnosis.

The precise question of hypnosis is unique in our state, so this court must look to other jurisdictions for consideration of the question. The majority view holds that pretrial hypnosis does not, as a matter of law, render resulting identification and testimony related thereto inadmissible. The line of authority admitting such evidence reasons that hypnosis aids recall, and later identifications are made from refreshed recollections. Such recollections have been likened to much the same as memories refreshed by diaries, memos and the like. This line of authority also concludes that the effect of the hypnosis is a matter to be weighed by the trier of fact.

A case which takes up the issue of pretrial identification procedure in particular is *People v. Hughes*, 99 Misc.2d 863, 417 N.Y. S.2d 643 (1979). The case involved a rape victim unable to recall anything about a rape and an assault. The victim was hypnotized and thereafter, able to recall details

of the attack and the name of her assailant. The opinion provides a detailed explanation of hypnosis, its history and describes the growing use of hypnosis in criminal investigation. The New York Court stated that in civil cases, hypnosis has been held only to affect the weight of the evidence and that criminal cases dealing with the admissibility of a witness in a criminal case subsequent to hypnosis seem to follow the civil approach. In *Hughes,* 417 N.Y.S.2d at 648, the court concluded, "... that testimony, which is hypnotically induced recollection, is not inadmissible as a matter of law. Given a proper foundation of general acceptance in the scientific community and adequate procedural safeguards to insure reliability, this court believes that evidence elicited through hypnosis can be valuable to the determination of the guilt or innocence of those who have been accused of crimes."

For other authority supporting the acceptance of testimony following hypnosis, see *State v. Jorgensen,* 8 Or.App. 1, 492 P.2d 312 (1971), which held that hypnosis goes to the weight of the testimony; *People v. Smrekar,* 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979), which held that hypnosis goes to the weight of evidence where (1) the hypnotist was shown to be competent; (2) the evidence reveals no suggestion employed during hypnosis session; (3) other substantial evidence corroborated identification and (4) witness had ample opportunity to view assailant at the time of the occurrence; *Clark v. State,* 379 So.2d 372 (Fla.App.1979) which held that testimony goes to the weight thereof since it is made upon "present recollection refreshed"; *Harding v. State,* 5 Md.App. 230, 246 A.2d 302 (1968), cert. denied, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), which held it is a matter of weight of testimony; *United States v. Adams,* 581 F.2d 193 (9th Cir. 1978), cert. denied, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), which held that failure to disclose hypnosis is a basis for reversal; *United States v. Awkard,* 597 F.2d 667 (9th Cir. 1979), cert. denied, 444 U.S. 885, 969, 100 S.Ct. 179, 460, 62 L.Ed.2d 116, 383 (1979), which held that it goes to weight, if disclosed to the jury; *State v.*

*Hurd,* 173 N.J.Super. 333, 414 A.2d 291 (1980), which held that such evidence is admissible if procedural safeguards are followed so that no impermissible suggestion is allowed; *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978) which held that the credibility of such evidence is for the jury to determine; and *United States v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977), which held that the possibility of misidentification is not sufficient grounds for exclusion of such evidence where defendant failed to prove "very substantial likelihood of irreparable misidentification".

As contrasted with the above line of authority during oral argument of the instant case, appellant brought to this court's attention the case of *State v. Mack,* 292 N.W.2d 764 (Minn.1980). The court in *Mack* applied the rule in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), with the result being that Minnesota holds that testimony of a previously hypnotized witness is inadmissible as a matter of law. The Minnesota court in *Mack* refers to the entry of the victim into a "deep hypnotic state" and expresses concern over the possibilities of prehypnotic and posthypnotic status. In *Mack,* the court simply refuses, under *Frye,* to accept the value of hypnosis as a matter of law.

With the foregoing authority as a background on this issue, pertinent facts in the instant case must again be referred to as they relate to the disposition of this issue. The record shows that both victims had separately and independently given a description of their abductor prior to any hypnotic session. There was no suggestion of any detail, event, persons or any other specific or general reference to the matter and the information given by the victims was their own statement. The most significant factors which distinguish the prehypnotic session related to the identification of appellant, and those details given during the hypnotic session were the added features of "Oriental or Egyptian eyes, broad flat nose, heavy lips, very slight fingers and no jewelry". Appellant admits that the hypnotic session did not produce a description "sig-

nificantly different or more detailed" than that previously given.

There is nothing in the instant case which supports appellant's contention than any impermissible suggestion occurred which would result in a "very substantial likelihood of irreparable misidentification". Further, the record of this case supports the in–court identification of appellant by both victims upon present recollection. Appellant made no attempt to conceal his identity at the time of abduction, during the entry into the place where the sexual acts occurred, or during departure from said location. The only questionable period of time regarding the continued possible observation of appellant by the victims is during the time they were blindfolded and assaulted. Even in the latter instance, one victim was able to see through her blindfold during the actual sexual assaults.

■ Appellant pursues his argument further and attacks the photographic array wherefrom appellant's photograph was selected separately and independently by both victims. The victims were shown an array of photographs on two separate occasions. In the first instance, no selection was made by either victim, but appellant's photo was not among the array. On the second occasion, the victims separately viewed 13 photos. Of this group, appellant appeared in four photos. The victims, without conference with each other, independently identified appellant from the photographic array. While no case involving the precise factual situation has been found, it has been held that the showing of only one picture of an accused to a witness was not improper, see *State v. Parker*, 458 S.W.2d 241 (Mo.1970) and *State v. Greenlaw*, 593 S.W.2d 641 (Mo. App.1980). There is nothing upon the record of the instant case which shows anything other than the fact that a multiple number of photographs were shown to the victims who in turn independently identified appellant from the photographs. There is nothing of record in the instant case to support appellant's contention that such photographic array was in any manner impermissibly suggestive and such argument is found to be without merit.

■ Appellant argues still further that the lineup from which both victims separately and independently identified him was impermissibly suggestive. Appellant had been arrested and was in custody in Murphysboro, Illinois. The victims traveled to the courthouse in Murphysboro. The victims observed appellant, along with seven other black men, through a window in a courtroom door. The victims were separated to prevent discussion or comparison between them for purposes of identification. Each victim was given a piece of paper and asked to place a number on the paper if they identified any of the persons inside the courtroom. As the persons were so aligned inside the courtroom, appellant was number four from the left and each victim separately and independently marked that number on their respective pieces of paper.

Appellant argues that he was the shortest of the eight men in the courtroom and the manner in which the eight were located formed a "V" shape with the base of the "V" pointing to appellant, directly implicating him. The facts on the record dispel appellant's contention. In the first instance, three of the other seven men were nearly the same height as appellant. In addition, the record reveals that while from left to right the heights of the individuals descended down to appellant, the persons on appellant's far right did not ascend in any order of height toward the location of appellant. It has been held that dissimilarity in height does not provide sufficient basis to hold that a lineup was permissibly suggestive, see *State v. Gant*, 586 S.W.2d 755 (Mo.App.1979); *State v. Bivens*, 558 S.W.2d 296 (Mo.App.1977) and *Gaitan v. State*, 464 S.W.2d 33 (Mo.1971). There is no merit to appellant's argument that the identification of appellant was unreliable because the lineup was impermissibly suggestive.

■ There is nothing upon the record of this case to support appellant's contention that the identification of appellant was unreliable upon the premise of impermissible suggestiveness. Appellant's argument that employment of hypnosis rendered all identi-

fication unreliable is by this court rejected. It is the opinion of this court that absent the showing that use of hypnosis was impermissibly suggestive so that "a very substantial likelihood of irreparable misidentification" occurred, the evidence based thereon was not inadmissible as a matter of law, but rather such hypnotic process goes to the weight of the testimony of the evidence and is a matter for determination by the trier of fact.

Even in the absence of impermissible suggestion, were the identifications of appellant herein still reliable? *State v. Higgins* and *Manson v. Braithwaite, supra,* mandate that the key to admissible identification is the reliability of that identification.

■ As discussed above, the record herein reflects no impermissible suggestiveness in the identification of appellant. The task of this court under existing authority is to review the reliability of identification from the "totality of the circumstances", see *Neil v. Biggers, supra.* The factors to be considered in the "totality of the circumstances" include the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontations", *Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382. See also *State v. Higgins, supra,* at 160 and *State v. Kent,* 602 S.W.2d 799 (Mo.App. 1980).

■ In the instant case, the evidence was uncontroverted that appellant forced his way into the victim's stationwagon. Appellant made no attempt to conceal his face. Appellant walked to the location of the sexual assaults with both victims, again making no effort to conceal his face. Prior to the actual sexual assaults, both victims, while inside the house, observed appellant's face and the rest of his appearance. Even during the actual assaults, one victim could see through her blindfold. Hence, there was more than ample opportunity to view the appellant "at the time of the crime".

Both victims were attentive to what was going on. Both victims provided police officers a description within a short time following the assault upon them. That description varied little and without marked difference from subsequent identification by both victims. The consistency of the victims' identification tends to establish the degree of attention and accuracy of the victims' prior descriptions. As to the level of certainty, one victim continuously and without reservation identified appellant by verbal description, the photographic array, the lineup and a positive in–court identification. The other victim expressed only one reservation as to complete and total positive identification, and that was the hearing of appellant's voice. The identity of the voice which led to an unequivocal positive identification by the second victim occurred when appellant made repeated outbursts during the course of trial in the courtroom. Regarding the final element, time, the record shows a general description of the night of the assault. This was followed by the observance of a photographic array three weeks later. That procedure was followed by the lineup observation some thirty–seven days later. It cannot be said that an unwarranted amount of time lapsed between the time of the crime and the time of confrontation for purposes of competent identification.

Considering the totality of the circumstances, the standard set forth has been met, thereby rendering the identification of appellant reliable for purposes of its admissibility.

As set forth above, the court, at the outset, posed four questions which the court felt necessitated an answer in disposition of appellant's final point. Question one, based upon the foregoing, is answered in the negative as this court finds the use of hypnosis under the particular facts and circumstances of this case was not inherently unreliable and such matter does not go to its inadmissibility as a matter of law, rather, it is a matter to be weighed by the trier of fact. The evidence upon this record does not support appellant's contention that the hypno-

sis session revealed any impermissible suggestion. Regarding questions two and three, they are answered in the negative as the record fails to support the contention that the photographic array and the police lineup contained any element of impermissible suggestion. Question four is also answered in the negative because when the "totality of the circumstances" is considered from this record, the identification of appellant upon the reasons set forth above renders such identification reliable for purposes of its admission in evidence.

Point three is ruled against appellant.

For the foregoing reasons, that portion of the judgment relating to the convictions for armed criminal action is reversed. For the foregoing reasons, that portion of the judgment relating to the convictions for kidnapping, rape and sodomy is in all respects affirmed.

All concur.