**STATE of Missouri, Respondent,**

v.

**Ray Dean ONKEN, Appellant.**

**No. WD 33996.**

Missouri Court of Appeals,
Western District.

Sept. 20, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 15, 1983.

Application to Transfer Denied
Dec. 20, 1983.

George M. Ely, Hamilton, for appellant.

John Ashcroft, Atty. Gen., George W. Cox, III, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P.J., TURNAGE, C.J., and MANFORD, J.

MANFORD, Judge.

This is a direct appeal from a jury conviction for murder, second degree, in violation of § 565.004, RSMo 1978. The judgment is reversed and the cause is remanded.

While three points are presented on appeal, only one thereof is considered because of the disposition of this appeal. Appellant charges the court erred in permitting opinion evidence regarding the similarity of the victim's blood and blood found upon appellant's clothing, because there was insufficient foundation, and said opinion was not supported by evidence of the scientific accuracy and reliability of the technique used to establish the statistical validity of blood enzyme and protein appearance in human blood.[1]

The record discloses the following pertinent facts:

During the late evening of September 26, 1981 and the early morning hours of September 27, 1981, Brian Stroud and Ricky Sayre were in Green City, Missouri. Upon returning to Stroud's home, they found the doors locked. They observed lights on in the house which was occupied by Cheryl Newcomer, her live-in boyfriend (appellant), her two children, and the boyfriend's (appellant's) son. Stroud and Sayre went to the Newcomer residence and were admitted by appellant. Cheryl Newcomer, as well as the children, had gone to bed. The trio decided to play cards for whiskey. Stroud and Sayre left, and returned after stealing two fifths of whiskey. The trio played cards and drank until about 3:15 a.m., at which time Stroud and Sayre left for home. While Stroud and Sayre were at the Newcomer residence, the victim (the 19-month-old daughter of Cheryl Newcomer) awakened and was brought into the kitchen by appellant. The victim appeared in a normal and uninjured condition. While appellant was in the victim's bedroom, Stroud and Sayre heard a "thump".

Appellant stated that while Stroud and Sayre were gone to secure some whiskey, he took two "Motran" tablets orally, and then injected himself with "Tylox". Appellant stated that he did this because he was having pain in his hip. Testimony relative to the prior day's activities and the card game revealed that in addition to the drugs taken by appellant and the whiskey consumed during the card game, appellant also consumed six or eight mixed drinks.

After Stroud and Sayre left, appellant testified that he went to bed with Cheryl Newcomer. He stated that he removed his pants and shorts. Cheryl Newcomer was asleep, but vaguely recalled someone getting in the bed. She did not know the time. She testified that at about 6:00 a.m., she was awakened by the sound of appellant being sick in the bathroom. She stated that she observed appellant, gave him a shove, and that he "puked" and fell, striking his hand on a floor register. She observed no injury to appellant as a result of his fall. Cheryl Newcomer unsuccessfully tried to get appellant into bed, became "aggravated", gave up, and walked out of the bathroom. She proceeded to the kitchen, got a drink of Kool-aid, and then "looked into the kids' room." She did not enter the room, but looked to see if the victim and appellant's son (appellant's two-year old son shared the bedroom with the victim) were in bed. She returned to bed and found appellant in their bed.

Later that morning, appellant's son brought the family kitten into the master bedroom shared by appellant and Cheryl Newcomer. After playing with the kitten, Cheryl Newcomer asked appellant's son to go awaken the victim. The hour was approximately 10:30 a.m. Cheryl Newcomer heard appellant's son playing with toys, and then the boy returned to the master bed-

---

1. It is noted that the same charge of error is lodged against opinion testimony regarding hair samples. This opinion does not specifically address that second error, but it should be understood that the ruling made on appellant's error relative to blood enzymes and proteins is equally applicable to his challenge on hair samples, even though that charged error is not specifically addressed herein.

room, shook his head, and said "wake". Cheryl Newcomer went to the children's bedroom. She observed the victim lying on her back, touched her, and noticed that the victim was cold. Cheryl Newcomer went through the house screaming for appellant to wake up. She was not certain whether at this point she observed scratches and bruises on the victim's face, but she did observe that the victim did not have on the undergarments or outer plastic pants which she had placed on the victim when the latter was put to bed. Cheryl Newcomer awakened appellant, and observed him putting on his undershorts and pants.

Cheryl Newcomer's parents, who lived across the street, were summoned, as well as local police authorities. In addition, the Zone Commander for the Missouri Highway Patrol, the local coroner, and an area physician also arrived. Police authorities investigated the scene, and observed no forced entry into the residence. The physician, an area resident pathologist who examined the victim at the scene, testified that she observed bruises to the left side of the victim's face, a cut on the victim's chin, and several bruises about the neck, head, back, and abdomen. She also observed a split or tear in the skin about the size of a fifty-cent piece, at the opening of the victim's vagina, which in her opinion, was consistent with sexual assault. This physician placed the time of death some six to eight hours prior to the discovery of the body.

Autopsy results were consistent with the genital injury depicted by the first examining physician. In addition, the autopsy confirmed multiple bruises and lacerations to the victim. The actual cause of death was listed as "pericardial tamponade ... due to the rupture of the heart and due to the severe trauma to the chest." This autopsy was performed by a staff pathologist with Kirksville Osteopathic Hospital in Kirksville, Missouri.

As part of the scene investigation, officers secured the victim's clothing and certain bedding items. They also interviewed appellant and Cheryl Newcomer, obtaining statements from each. The Missouri High-

way Patrol trooper involved in the investigation testified that he took the first statement from appellant at approximately 3:30 p.m. on the afternoon of September 27, 1981. Proper *Miranda* warnings were given, and subsequently waived by appellant. Appellant's statement gave an account of the day's events for September 26, 1981, and the card game with Stroud and Sayre.

The trooper had observed an injury to appellant's left hand. Appellant stated, "I think I got [that] when I fell in the bathroom." In this statement, appellant declared, "I know of nothing I did to Billie Newcomer to cause her death." At this time, appellant voluntarily gave a sample of his head and pubic hair. While appellant was providing a sample of his pubic hair, the trooper observed a stained area on the front of appellant's shorts. The trooper requested, and appellant voluntarily gave his shorts to the trooper. The trooper testified that at the time appellant was removing his shorts, appellant said, "This has me worried now." On October 1, 1981, the same trooper took another statement from appellant after a proper *Miranda* warning and a waiver of same. After securing the second statement, the trooper placed appellant under arrest.

As part of the state's case, one Thomas Grant was called as a witness. It is the challenge to the testimony of this witness which provides the basis of this appeal. Appellant testified on his own behalf. He defended on complete denial of any attack upon the victim.

The state's witness, Grant, was sworn, and prefatory to his testimony relative to certain scientific tests concerning blood analysis and hair analysis and the results thereof, he listed his qualifications. His qualifications were not challenged at trial or on this appeal.

At the outset, respondent contends that appellant has failed to properly preserve for review the challenge to Grant's testimony. Respondent points out that appellant's objection was that Grant's opinion was not sufficiently certain for the admission of same in a criminal proceeding where the

burden of proof is beyond a reasonable doubt. Respondent contends that for the first time on appeal appellant presents the issue of an improper foundation for Grant's opinion, and thus the issue is beyond the scope of appellate review. Respondent cites *State v. McGrath,* 603 S.W.2d 518, 520 (Mo. 1980), *State v. Ashley,* 616 S.W.2d 556, 561 (Mo.App.1981), and *State v. Boclair,* 621 S.W.2d 347, 349 (Mo.App.1981) in support of the rule that absent objection at trial, an issue is not reviewable on appeal for failure to preserve the issue, except for plain error. Respondent further contends that appellant failed to properly object to the reliability of the tests performed by Grant, and by such failure, this court cannot now consider such a challenge. Respondent cites *State v. Pernell,* 606 S.W.2d 389, 392 (Mo.App.1979). From this, respondent contends that review by this court is confined to a review for plain error.

This court acknowledges that appellant's objection was inartfully stated, but it is found that said objection, in substance, was a challenge to the reliability of the tests performed by Grant. This finding thus dispels respondent's contentions under both *McGrath* and *Pernell, supra.* What the record reveals is a less than obvious and inartful objection as to its wording, but when reviewed for substance, this court concludes that the objection barely constitutes an objection to an improper foundation.

Because of the disposition of this appeal, it serves no purpose to reiterate Grant's testimony. This court only notes that such testimony was very detailed and well-articulated.

This case must be reversed and appellant granted a new trial for the simple reason that nowhere in Grant's testimony was he asked about, or did he testify to two critical elements relative to the scientific tests and procedures he performed that were the basis for his conclusion.

Grant was never asked about, nor did he ever identify the system, method, procedure (or whatever name his procedures are labeled) that he followed. In addition and more importantly, Grant was never asked, nor did he ever testify whether the system, method, procedure, etc., that he followed had been sufficiently established to have gained general acceptance in the particular field in which it belongs. This rule is set forth by the benchmark decision in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013, 1014 (1923), which our courts have long recognized and followed. See also *State v. Sager,* 600 S.W.2d 541, 562 (Mo.App.1980). The record reveals that no other witness was called to satisfy the rule in *Frye.*

This court does not reach or resolve the issue of the acceptability of blood analysis system testing, nor consideration of expert opinion thereon, because in the instant case, the primary rule for that question to be presented to this court was not followed. *Frye, supra.* This declaration is made so that there is no misunderstanding between either of the parties herein or any reader of this opinion. The question herein is not whether the evidence, as submitted by respondent, was insufficient to sustain the verdict. The question is whether error was committed in the admission of evidence to meet the requirements of the rule set forth in *Frye, supra.*

The retrial of appellant does not place him in double jeopardy. This precise question has been laid to rest by our state Supreme Court in *State v. Wood,* 596 S.W.2d 394 (Mo. banc 1980). Like *Wood,* the instant case calls for reversal upon the trial court's error in improperly admitting the challenged evidence, and the issue is not the insufficiency of the evidence to sustain a verdict. If this case presented the issue of insufficient evidence, appellant could not be retried under the rule declared in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), cited in *Wood, supra.* The rule in *Burks* simply has no application to the instant case, and the rule in *Wood* is both controlling and dispositive of this question.

For the reasons set forth herein, the judgment is reversed and this cause is remanded for further proceedings consistent with this opinion.

All concur.