Carl ALSBACH, Plaintiff-Appellant,

v.

Margaret Sue BADER and Gretson Corbitt, Defendants-Respondents.

State Farm Mutual Automobile Insurance Company,
Intervenor-Defendant-Respondent.

No. 66470.

Supreme Court of Missouri,
En Banc.

Nov. 21, 1985.

Rehearing Denied Dec. 17, 1985.

Frank J. Niesen, Jr., Donald H. Clooney, St. Louis, for plaintiff-appellant.

Joseph P. Cunningham, III, Festus, for defendant-respondent.

Eugene K. Buckley, Robert D. Arb, St. Louis, for intervenor-defendant-respondent.

HIGGINS, Chief Justice.

Plaintiff suffered a verdict directed for defendants in an action for damages for personal injuries sustained in a motor vehicle collision. The court of appeals reversed and remanded the judgment by an opinion which held that plaintiff's memory refreshed from hypnotic concentration may be admitted to make a submissible case. This Court transferred the case on application of defendants. The judgment of the trial court is affirmed.

On June 2, 1979, at approximately 2:45 a.m., an automobile driven by Carl J. Alsbach collided with a pickup truck operated by Margaret Sue Bader and owned by her employer, Gretson Corbitt. The collision occurred on Highway 21A, a two-lane highway in Jefferson County, Missouri. Alsbach was operating his vehicle in an eastbound direction; Bader was operating her vehicle in a westbound direction. After the collision, Alsbach's vehicle came to rest at a 45 degree angle with the front two-and-one-half feet of his vehicle protruding into the westbound lane. Bader's vehicle came to rest on an embankment north of the shoulder adjacent to the westbound lanes; no parts of Bader's pickup truck were found in the eastbound lane. Frank Siebert passed by the scene of the collision about 15–20 minutes after it occurred; he verified this post-collision position of the vehicles. Following the collision, Alsbach had no memory of the positions of the automobile immediately prior to impact except for seeing a single headlight coming west on Highway 21A approximately 500 feet from him.

On June 26, 1979, Alsbach filed suit against Bader and Bader's employer, Cor-

bitt, and alleged that Bader was travelling at an excessive speed and was on the wrong side of the road. Bader denied these allegations and alleged that Alsbach was travelling at an excessive speed and was on the wrong side of the road. Uninsured motorist carrier, State Farm Mutual Automobile Insurance Company, intervened.

Some 19 months later, on January 24, 1981, Alsbach was hypnotized by Dr. George Ulett, a psychiatrist, in an attempt to aid Alsbach to recall his version of what happened immediately prior to impact. During the hypnotic session, Dr. Ulett led Alsbach through various procedures on concentration. Alsbach was then directed to recount his version of what happened on the night of the collision. During the session, Alsbach specifically recalled two headlights approaching. Following the session, Alsbach specifically remembered that Bader's vehicle crossed the center line and struck his vehicle in his lane of travel. The hypnotic session was audio taped; Dr. Ulett said a video tape was unnecessary to detect improper suggestions because the patient's eyes were closed. Dr. Ulett opined that Alsbach's memory with respect to the events of the collision was refreshed from the hypnotic concentration.

State Farm filed a motion in limine to prevent Alsbach's testimony on matters which he remembered only after being refreshed through hypnosis; the trial court sustained the motion. At trial, objection to Alsbach's testimony concerning his post-hypnotic testimony was again sustained. Alsbach then made an offer of proof which consisted of the proposed testimony of Alsbach and Dr. Ulett, the audio tape of the hypnotic session, a typed transcript of the session, and the deposition of Dr. Ulett. The offer was refused, and the trial court entered judgment for defendants on plaintiff's failure to make a submissible case.

Alsbach contends that the trial court erred in failing to allow him to testify from his "present memory and recollection" to the events surrounding the collision. The court of appeals was persuaded that testimony refreshed from hypnotic concentration may be admitted in a civil case providing the trial judge, in advance of the admission of the testimony, approves admission following certain guidelines.

The question is whether a witness, in order to make a submissible case for himself, may be allowed to testify about events remembered only after he has undergone hypnosis. In accord with the recent and persuasive trend of authority in other jurisdictions and the concensus of expert opinion, this Court concludes that such post-hypnotic testimony lacks scientific support for its reliability and should, therefore, not be admitted in the courts of Missouri.

Hypnosis has been defined as "an artificially induced trancelike state ... in which the subject is highly susceptible to suggestion, oblivious to all else, and responds readily to the commands of the hypnotist." Stedman's Medical Dictionary, 678 (5th Lawyers' ed. 1982). A hypnotized subject suspends critical judgment and responds to the hypnotist's demand for exact, photographic recall even when the subject's memory is vague or doubtful. Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif.L.Rev. 313, 340 (1980).

Some jurisdictions permit testimony refreshed by hypnosis to go to the jury on the view that hypnosis affects only the weight of the testimony, not its admissibility; other jurisdictions admit hypnotically induced testimony subject to procedural requirements which seek to ensure reliability; a third group follows a *per se* exclusionary rule relying upon the standard of general scientific recognition established in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *People v. Shirley*, 31 Cal.3d 18, 181 Cal. Rptr. 243, 641 P.2d 775 (1982), *cert. denied*, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); *see* Annot., 92 A.L.R.3d 442 (1979).

The jurisdictions that adhere to the first view treat hypnotically refreshed recollection as no different from recollections refreshed in other legally acceptable ways. The use of hypnosis affects only the weight and credibility, not the admissibility, of a

witness's testimony. *State v. Brown*, 337 N.W.2d 138 (N.D.1983); *State v. Glebock*, 616 S.W.2d 897 (Tenn.Cr.App.1981). Cross-examination, expert testimony on the inherent risks of hypnosis, as well as cautionary instructions are expected to enable the jury to accurately assess the credibility of the evidence. *Chapman v. State*, 638 P.2d 1280, 1282–1284 (Wyo.1982). *See* Ruffra, Hypnotically Induced Testimony: Should it be Admitted? 19 Crim.L.Bull 293, 298 (1983). Alsbach asserts that this is the "better reasoned" approach. There is no doubt that the judge or jury, aided by cross-examination, may be expected to be able to evaluate the effects of bias, leading questions, and the problems of eyewitness testimony itself; but a different case exists when the trier of fact must realistically evaluate the effects of hypnosis on hypnotically induced testimony. The experts generally agree that the trier's ability to observe a witness's demeanor and analyze a witness's ability to perceive, remember, and articulate is so hampered by the hypnotic process that the probative value of post-hypnotic testimony cannot overcome its shortcomings. Until there is general scientific acceptance of hypnosis as a reliable means of refreshing recollection, the dangers inherent in the use of hypnotically induced testimony should bar a rule providing for its *per se* admission. *E.g., State ex rel. Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982).

In support of a rule of *per se* admissibility of hypnotically-refreshed testimony, Alsbach cites *State v. Greer*, 609 S.W.2d 423 (Mo.App.1980), *vacated on other grounds*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981), and *State v. Little*, 674 S.W.2d 541 (Mo.banc 1984), *cert. denied, Little v. Missouri*, —— U.S. ——, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985). In *Greer*, the court held that pretrial hypnosis does not, as a matter of law, render resulting identification and testimony related thereto inadmissible, and that the effect of hypnosis is a matter to be weighed by the trier of fact. *Id.* at 435. Because of the recent development in the understanding of hypnosis and the judicial trend away from acceptance,

this Court has examined the position in *Greer* and determines it should not be followed. Many of the cases cited by the court have since been overruled or modified. For example, the court relied on *People v. Hughes*, 99 Misc.2d 863, 417 N.Y. S.2d 643 (1979), for the proposition that hypnotically induced recollection, is not inadmissible as a matter of law. This holding was overruled by the Supreme Court, Appellate Division, Fourth Department, in *People v. Hughes*, 88 A.D.2d 17, 452 N.Y. S.2d 929 (1982). The Appellate Division held that the use of hypnosis had not gained general acceptance in the scientific community as a reliable method of restoring a witness's recollection and therefore hypnotically produced recall was, as a matter of law, inadmissible. This decision was affirmed by the court of appeals. *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983). The court also relied upon *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), which held that hypnosis goes to the weight of the testimony without discussion of the general scientific acceptance of the use of hypnosis. Since *Greer*, the Maryland courts have reexamined and overruled *Harding*. *Collins v. State*, 52 Md.App. 186, 447 A.2d 1272, 1283 (1982), *aff'd* 296 Md. 670, 464 A.2d 1028 (1983); *Polk v. State*, 48 Md.App. 382, 427 A.2d 1041 (1981). *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978), has been overruled in *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984), which reexamined the position taken in *McQueen* and held that a witness's hypnotically refreshed testimony was inadmissible. Other authorities relied upon in *Greer, e.g., State v. Jorgensen*, 8 Or.App. 1, 492 P.2d 312 (1971); *Clark v. State*, 379 So.2d 372 (Fla.App.1979); *United States v. Adams*, 581 F.2d 193 (9th Cir.1978), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *United States v. Awkard*, 597 F.2d 667 (9th Cir. 1979), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979), based their hold-

ings on *Harding;* accordingly they are of no precedential value.

Still other cases cited in *Greer* stand for the proposition that the testimony of a witness who has experienced hypnosis is admissible, but only if certain safeguards could be shown. *People v. Smrekar,* 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *State v. Hurd,* 173 N.J.Super 333, 414 A.2d 291 (1980), *aff'd.,* 86 N.J. 525, 432 A.2d 86 (1981).

In furtherance of this approach, Alsbach relies on *State v. Little,* 674 S.W.2d 541 (Mo. banc 1984), which did not address the issue of post-hypnotic testimony. This Court observed, "Although the court of appeals thought that this case might be an appropriate vehicle for a detailed exposition of the law relating to testimony aided by hypnosis, we do not find any basis for a conclusion that the identification testimony was tainted by improper suggestion." *Id.* at 542. Referring to the writer of *Greer,* this Court continued, "We do not reach the points he covered, because of the total absence of any indication that the hypnotic procedures employed in this case had any effect whatsoever, and there is no occasion for us to comment further or to consider the cases which have been decided in other jurisdictions since *Greer.*" *Id.* at 544. Alsbach's reliance on *Little* is misplaced.

Alsbach attempts an argument for his position based on section 491.060, RSMo 1978, dealing with persons incompetent to testify. Such an argument has no application to this case.

The second view, that employed by the court of appeals, allows for the admissibility of hypnotically induced testimony if certain procedural "safeguards" are followed. These safeguards are said to reduce the possibilities for suggestiveness and attempt to provide a means to verify independently the post-hypnotic testimony of a witness. The following minimum safeguards have been suggested:

(1) The hypnotic session or sessions must have been administered by a licensed psychiatrist or psychologist trained in the use of hypnosis.

(2) Any information given to the hypnotist by law enforcement personnel, by the defendant or from any other source prior to the hypnotic session should be in written form and should be preserved so that subsequently the extent of the information the subject received from the hypnotist may be determined.

(3) Before induction of hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them, carefully avoiding any new elements to the witness's description of the events. The witness's pre-hypnotic memory should be preserved via tape recording or, if possible, video tape.

(4) The entire procedure of hypnosis and the hypnotic interview should be tape recorded or, if possible, video taped.

(5) Only the hypnotist and the subject should be present during any phase of the hypnotic session, including the pre-hypnotic testing and post-hypnotic interview.

(6) The opposing party or parties should have full access, prior to trial, to the recording of the hypnotic interview.

(7) All opposing parties must be given free rein to cross-examine the hypnotically-induced witness and/or the hypnotist regarding the witness's memory and the particular procedure used to refresh it.

(8) No hypnotically-enhanced statements made by a witness or victim may be received into evidence unless there is available otherwise admissible corroborating testimony or physical evidence which tends to substantiate the hypnotically-enhanced statements.

*House v. State,* 445 So.2d 815, 826–827 (Miss.1984). *See also, e.g., Sprynczynatyk v. General Motors,* 771 F.2d 1112 (8th Cir. 1985); *Brown v. State,* 426 So.2d 76, 90–94 (Fla.App.1983); *State v. Hurd,* 432 A.2d at 89–90; *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571, 578 (1984).

This Court is not persuaded that the suggested procedural safeguards are sufficient to avoid the risks inherent in admitting hypnotically induced testimony. As

one commentator has observed: "The greatest variable in the hypnosis of an individual is the individual himself." Dilloff, The Admissibility of Hypnotically Influenced Testimony, 4 Ohio N.U.L.Rev. 1, 5 (1977). Such safeguards do not adequately address how a lay person, such as a trial judge or juror, will recognize when the hypnotized subject has lost his critical judgment and begun to credit "memories" that were formerly viewed as unreliable. Nor do safeguards provide a means for distinguishing between actual recall and confabulation invented and employed to fill gaps in the story. *State ex rel. Collins v. Superior Court,* 644 P.2d at 1270. Also, the trier of fact is not apprised how to detect when the subject has exhibited an unwarranted confidence in the validity of his ensuing recollection. *People v. Shirley,* 641 P.2d at 787. The administration of procedural safeguards would lead to elaborate demands for discovery, expert witnesses, and special pretrial hearings, and accordingly inject undue delay, confusion and costs into the judicial process. *State v. Mack,* 292 N.W.2d 764, 766 (Minn.1980). It would be difficult to establish whether the hypnotist was sufficiently independent of the prosecution or defense to avoid a subconscious bias. Because of the unpredictability of what influences a subject, it would be difficult to identify impermissible cues, even with the aid of a video tape of the hypnotic session. *State v. Hurd,* 432 A.2d at 97. *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984).

If the suggested procedural safeguards were applied in this case, the events surrounding Alsbach's hypnotic session tend to impeach rather than support the position that the testimony should be admissible. A safeguards approach generally provides that any information given to the hypnotist by the subject or from any other source should be in written form and should be preserved; the information provided by Alsbach and his attorney to Dr. Ulett prior to the hypnotic session was not furnished in writing or otherwise recorded and preserved. *House v. State,* 445 So.2d at 826–827 (Guidelines 2 & 3). The hypnotic session itself took place over 19 months after the collision, during which time Alsbach spoke to his attorney and his father, both of whom were attempting to reconstruct the events surrounding the collision; and Alsbach now knew that the crucial issue to his recovery in this case was whether Bader's vehicle was on the wrong side of the road. Such conviction and motivation could carry into the hypnotic session. *State ex rel. Collins,* 644 P.2d at 1289.

Neither can it be said that there is any evidence corroborative of Alsbach's posthypnotic statements. *House v. State,* 445 So.2d at 826–827 (Guideline 8). *Cf. State v. Little,* 674 S.W.2d 541 (Mo. banc 1984). To the contrary, the evidence contradicts Alsbach's story. During his recollection of the events under hypnosis, Alsbach stated he saw two headlights approaching; prior to hypnosis his only memory was of seeing one headlight approaching. In contrast, Bader has a clear recollection, unaided by hypnosis, that Alsbach encroached her westbound lane. The physical evidence at the scene substantiates Bader's version because Alsbach's car was protruding into Bader's lane after the collision and no parts of Bader's pickup truck were found in Alsbach's lane. Finally, Alsbach produced no witnesses to verify his version of events.

A number of courts have recently abandoned all pretenses of devising workable "safeguards" and have followed the third approach which imposes a *per se* rule of inadmissibility based on the test for the admission of scientific testimony announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). *See State v. Haislip,* 237 Kan. 461, 701 P.2d 909 (1985); *State ex rel. Collins,* 132 Ariz. 180, 644 P.2d 1266 (1982); *People v. Shirley,* 181 Cal.Rptr. 243, 641 P.2d 775 (1982); *Collins v. State,* 52 Md.App. 186, 447 A.2d 1272 (1982), *aff'd,* 296 Md. 670, 464 A.2d 1028 (1983); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *People v. Quintanar,* 659 P.2d 710 (Colo.App. 1982); *People v. Gonzales,* 108 Mich.App. 145, 310 N.W.2d 306 (1981), *aff'd,* 415 Mich. 615, 329 N.W.2d 743 (1982); *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436

A.2d 170, 176–78 (1981). *See* Note, Pretrial Hypnosis and Its Effect on Witness Competency in Criminal Trials, 62 Neb.L.Rev. 336, 346 (1983).

In *Frye v. United States,* the court ruled that evidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community. The court held lie detector results inadmissible, stating:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

*Id.* 293 F. at 1014.

This Court has explicitly adopted the *Frye* standard for determining the admissibility of new scientific techniques. *State v. Stout,* 478 S.W.2d 368 (Mo.1972) (application of neutron activation analysis to blood sample disapproved); *Imms v. Clarke,* 654 S.W.2d 281 (Mo.App.1983) (paternity blood testing approved); *State v. Sager,* 600 S.W.2d 541 (Mo.App.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981) (bite mark identification process approved); *State v. Johnson,* 539 S.W.2d 493, 501 (Mo.App.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977) (gunshot residue testing by neutron activation analysis approved). *See also State v. Onken,* 660 S.W.2d 312 (Mo.App.1983); *State v. Williams,* 659 S.W.2d 309 (Mo. App.1983).

In *State v. Biddle,* 599 S.W.2d 182 (Mo. banc 1980), this Court adopted its own version of the theory underlying *Frye.* In holding that the results of polygraph examinations are inadmissible as evidence, this Court stressed that the polygraph examination results lack wide scientific approval of their reliability. *Id.* at 191. *See also State v. Taylor,* 663 S.W.2d 235 (Mo. banc 1984); *State v. White,* 621 S.W.2d 287 (Mo.1981).

Alsbach contends the *Frye* and *Biddle* rules are inapplicable in hypnosis cases. He asserts *Frye* is limited to cases in which expert witnesses give an opinion, interpreting the results of blood pressure readings, machinery, electronics, or some other scientific gadgetry. He emphasizes that in cases involving hypnosis: (1) it is not the expert hypnotist who testifies, but rather the hypnotized subject; and (2) the process of hypnotizing a potential witness to improve recall does not involve blood pressure reading, machinery or electronics. Alsbach submits that the process of hypnosis is but an involvement of concentration and thinking, and thus does not fall under the ambit of the general rule governing the admissibility of scientific evidence. He argues that hypnosis is not a device which pretends to come up with truth, but is rather a device to aid the memory; as such, cross examination will permit the trier of fact to determine the truth and accuracy of hypnotically refreshed testimony.

This argument derives from an unduly restrictive reading of *Frye* and *Biddle.* Contrary to Alsbach's assertion, the rule on admissibility of scientific evidence as expressed in *Biddle* and *Frye* is not limited to the manipulation and interpretation of physical evidence alone. *State v. Taylor,* 663 S.W.2d 235 (Mo. banc 1984). Hypnosis is a scientific process to enhance a person's memory. Such enhanced memory, the result of the process of hypnosis, cannot be disassociated from the hypnosis process itself. In *Biddle* this Court held that the "results" of the polygraph examinations are inadmissible as evidence because they lack scientific support for their reliability. Similarly with the "results" of a polygraph examination, the credibility of hypnotically refreshed testimony depends upon the reli-

ability of the scientific procedure used. It is of no consequence that the results are offered by the expert—the hypnotist in this case, or the subject himself. The purpose of the rule is to prevent the jury from being misled by unproven and unsound scientific methods. *See People v. Shirley,* 641 P.2d at 795; *State v. Collins,* 464 A.2d at 1032–1034.

Applying the *Frye* and *Biddle* standards, the admission of post-hypnotic testimony depends on wide acceptance in the relevant scientific community of its reliability. *State v. Taylor,* 663 S.W.2d at 239. Rather than showing a general acceptance of the reliability of hypnotically induced testimony, the concensus of informed expert opinion shows it is an unreliable means of enhancing recall. *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651 (1984); *State v. Mack,* 292 N.W.2d 764 (Minn.1980).

The views of experts in the field indicate there are many problems inherent in the hypnotic process. *See, e.g., State ex rel. Collins,* 644 P.2d 1266 (1982). According to Alsbach's expert, Dr. Ulett, there are marked differences of opinion in almost every aspect of the subject. Hypnosis is by its nature a process of suggestion and one of its primary effects is that the hypnotized subject becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The suggestions can be entirely unintended and unperceived by the hypnotist himself. Often, the tone of voice, demeanor of the hypnotist, or "body language" of the hypnotist may be the agent of suggestion. Diamond, Inherent Problems, 68 Calif.L.Rev. at 330; *People v. Shirley,* 641 P.2d at 802–803; *State ex rel. Collins,* 644 P.2d at 1269. The hypnotized subject may unwittingly experience a compelling desire to please the hypnotist by reacting positively to his suggestions and consequently produce the particular responses he believes are expected of him. This is referred to as "hypercompliance." *Commonwealth v. Nazarovitch,* 436 A.2d at 174; *State v. Hurd,* 432 A.2d

at 93. Often, a hypnotized subject will produce a "memory" of an event that may be a combination of relevant actual facts, irrelevant actual facts taken from an unrelated prior experience of the subject, and conscious lies and confabulations. *State ex rel. Collins,* 644 P.2d at 1269–1272; *People v. Shirley,* 641 P.2d at 803. Because the subject under hypnosis experiences impaired critical judgment, he may give undue credence to vague and fragmentary memories upon which he would not have relied outside the hypnotic state. Orne, The Use and Misuse of Hypnosis in Court, 27 Int'l J. Clinical and Experimental Hypnosis 311, 317–319 (1979); *People v. Hughes,* 453 N.E.2d at 489–490.

It is likely that hypnotically induced testimony would be particularly dangerous at trial. Absent corroborating evidence, neither the subject nor the trier of fact would be able to distinguish between accurate recall and confabulations. Effective cross examination would be seriously impeded by the witness's confidence in the accuracy of his recall. The subjective conviction in the truth of the memory after hypnosis eliminates the fear of perjury as a factor ensuring reliable testimony. Diamond, Inherent Problems, 68 Cal.L.Rev. at 330. Jury observations may be adversely affected because the witness, after hypnosis, will have absolute subjective convictions about a set of facts, regardless of the objective accuracy of his perceptions. *State v. Martin,* 684 P.2d 651 (1984). Beaver, Memory Restored or Confabulated by Hypnosis—Is It Competent?, 6 U. Puget Sound L.Rev. 155, 199 (1983). Equally distressing, hypnotically refreshed testimony conveys to the trier of fact a misleading aura of reliability and certainty which might cause the trier of fact to be less critical of a witness's testimony. *People v. Gonzales,* 310 N.W.2d at 313; *State v. Stout,* 478 S.W.2d 368, 372 (Mo. banc 1972); State v. Biddle, 599 S.W.2d 182, 186 (Mo. banc 1980). Further harm might be caused by "expert" witnesses who, testifying on a party's behalf, make extravagant, scientifically unjustified

claims about the reliability of hypnotically enhanced testimony. Diamond, Inherent Problems, 68 Cal.L.Rev. 313, 348–349 (1980).

Hypnotically induced testimony in its current state does not meet the *Frye* and *Biddle* standards of reliability and accuracy. It has not yet achieved the status of general acceptance in a relevant scientific community as a reliable means of *restoring* recollection. Although recognized to be a valid therapeutic technique, it cannot be said that hypnosis is recognized as a valid fact-finding tool.

For the reasons stated, the judgment of the trial court is affirmed.

BILLINGS, DONNELLY and WELLIVER, JJ., and SEILER and BARRETT, Senior Judges, concur.

BLACKMAR, J., dissents in separate opinion filed.

ROBERTSON, J., not participating because not a member of the Court when cause was submitted.

RENDLEN, J., not sitting.

BLACKMAR, Judge, dissenting.

I dissent. I believe that the Court errs in adopting a per se exclusionary rule for hypnotically induced testimony. I would opt for the approach of *Sprynczynatzk v. General Motors Corporation*, 771 F.2d 1112 (8th Cir. August 16, 1985), holding that hypnotically induced testimony may be received in evidence if certain procedural standards are met. I have little to add to Judge Ross's thorough and well documented opinion in that case, which, along with the principal opinion, adduces substantially all of the case law and journal comment.

I do not sense substantial scientific disagreement over the proposition that a person's memory may be enhanced through hypnosis. Questions of reliability, then, should be addressed to juries, and not concluded by appellate decision. The polygraph situation is not comparable. The problem is that the hypnotist may influence the witness's recollection through suggestion. The question of whether there has been undue suggestion should be addressed initially to the hypnotist, and the jury may assess the hypnotist's credibility just as it does with all witnesses. The possibility that a witness may lie is no ground for excluding testimony.

Nor would I accept the proposition that the hypnotized witness may not be effectively cross-examined. The jury might be very suspicious of a witness who purports to remember legally significant events but has no memory, or inaccurate memory, of other events and details in the same time frame.[1] Juries might also be wary of a witness whose memory is belatedly refreshed, and well might accept the conflicting, unenhanced testimony of other witnesses. The witness who will lie following non-suggestive hypnosis would not hesitate to lie to aid his case without hypnosis.

If opposing counsel is fearful that the jury will give special credence to hypnotically enhanced testimony, the fact of hypnosis need not be brought out. The decision is a matter of trial strategy.

It has been suggested that the trial judge in this case might properly have excluded Alsbach's testimony, in the exercise of his discretion, because of the absence of procedural safeguards. It is clear from the transcript, however, that this particular trial judge foretold the principal opinion by applying a per-se exclusionary rule, on the analogy of the polygraph cases, and did not

---

1. It is reported that, in the celebrated "Queen's Case," 2 Broderip & Bingham 284 (1820), an Italian witness testified, through an interpreter, in great detail as to where the Queen slept on each night of a voyage, but, when asked where other passengers slept, consistently replied,

"non mi ricordo." The House of Lords was moved to discredit his testimony. *See* 3A Wigmore, *Evidence*, (Chadbourn Ed., 1970), p. 933; Stryker, *For the Defense*, (Doubleday, 1947), p. 549 ff.

consider that he had discretion. I would not foreclose the exercise of discretion if there were to be a retrial.

The law of evidence deals with probabilities and does not demand unobtainable certainty. I would reverse and remand for proceedings consistent with these expressed views.