**STATE of Missouri, Plaintiff–Appellant,**

v.

**Dennis BLACKMAN, Defendant–Respondent.**

No. 60987.

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 28, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 3, 1992.

Application to Transfer Denied
April 21, 1992.

---

Robert P. McCulloch, Pros. Atty., Clayton, for plaintiff-appellant.

Wittner, Poger & Rosenblum, P.C., N. Scott Rosenblum, Ramona L. Marten, St. Louis, for defendant-respondent.

CRANDALL, Presiding Judge.

The State of Missouri appeals from the order of the trial court which partially sustained, after an evidentiary hearing, the motions of defendant, Dennis Blackman, and ordered post-hypnotic and identification testimony suppressed. This interlocu-

tory appeal is filed under the provisions of § 547.200.1, RSMo (1986). We affirm.[1]

The record established that, at approximately 1:15 a.m., on January 11, 1991, Officer Joann Liscombe of the St. Louis County Police Department was shot. She died on January 14. The investigating officers interviewed several witnesses concerning a man that had been seen in the vicinity of the shooting. Two witnesses, Charles Myers and Steve Carter, stated that they had seen Officer Liscombe with a man at the intersection of Old Halls Ferry Road and Patricia Ridge, where she was later found fatally wounded.

Charles Myers told police that, on January 11, at about 1:00 a.m., he was inside a 7–Eleven store when a woman informed Officer Liscombe, who was also in the store, that there was a man walking in a strange manner on Old Halls Ferry Road. Officer Liscombe left the 7–Eleven store to investigate. Myers also left; and, out of curiosity, drove in the direction in which the woman had indicated the suspicious person could be found. As Myers approached the intersection of Patricia Ridge and Old Halls Ferry Road, he saw Officer Liscombe's patrol car stopped in front of him, in the far right lane of four-lane Old Halls Ferry Road. The lights on the light bar of the police vehicle were flashing. Myers observed Officer Liscombe standing in the street, facing a man. Myers saw only the man's profile. As he drove around the patrol car, his view of the man's face was blocked by Officer Liscombe's body. When he heard the following morning that Officer Liscombe had been shot, he contacted the police. He described the man he had seen with Officer Liscombe as black, approximately 6'0" to 6'2" tall, about 200 lbs., with a mustache and a small scraggly beard. He said that the man was wearing a black ski cap, a mid-thigh length, unzipped blue coat, a red and white plaid shirt, grey stone washed jeans, and black leather boots. The day after the shooting, Myers returned to the scene to conduct a photo reenactment of the events of Janu-

1. This appeal was initially lodged in the Missouri Supreme Court. It was transferred by order of that court to the Missouri Court of Appeals, Eastern District.

ary 11 and also participated in making a composite drawing of the person he had observed with Officer Liscombe.

The police interviewed the other witness, Steve Carter, on January 18, 1991. Carter stated that, as he was driving to his girlfriend's house, he saw a man walking on Patricia Ridge, staggering and swaying as he walked. Shortly thereafter, as he returned from his girlfriend's house, he saw a patrol car at the intersection of Old Halls Ferry Road and Patricia Ridge. The vehicle had pulled up next to the man he had seen earlier. The lights on the light bar of the car were flashing. Out of his rear-view mirror, he observed the man turn away, poised as if to run from the patrol car. He described the man as black, in his thirties, approximately 6'3" to 6'4" tall, between 215 and 230 lbs., with a mustache and a beard. He stated that the man was wearing a dark black, hip-length coat, black boots, and a brown cap. Carter conducted a photo reenactment of the events of January 11.

On January 29 and 31, 1991, respectively, Myers and Carter were hypnotized. In addition to the witnesses and the hypnotist, a county police officer was present during the sessions and asked several questions. The sessions were recorded, and the tapes were admitted into evidence at the hearing on defendant's motions.

After the hypnosis, neither Myers nor Carter provided descriptions which differed significantly from that which they had already given to police. Carter did add that the man was dark-skinned, that he wore a sweatshirt under his jacket, and that he had a "goatee." Myers added that the man was dark skinned, was about 40 to 45 years of age, and had a hole in his jeans at the knee.

Both Carter and Myers viewed several photo spreads at different times throughout the investigation. Myers viewed two physical lineups before the hypnosis session. Carter viewed one lineup after the hypnosis session. Neither witness identified anyone as the person they had seen with Officer Liscombe from either the lineups or the photo spreads. Defendant's photograph was not included in any of the photo spreads; and, until the lineup in question, he had not been in any of the lineups viewed by these two witnesses.

On February 19, 1991, defendant was placed in a lineup which Myers and Carter viewed separately. Carter immediately identified defendant as the person he had seen on January 11. Myers did not positively identify defendant at the lineup, but later informed police that defendant was the person he had seen with Officer Liscombe.

After the lineup, defendant was questioned further by the police and admitted to committing the murder of Officer Liscombe. He was formally charged with murder in the first degree, § 565.020.2, RSMo (1986), for which State acknowledges that it intends to seek the death penalty, and armed criminal action, § 571.015.1, RSMo (1986).

Defendant filed motions to suppress out-of-court and in-court identification testimony as well as all pre-hypnotic and post-hypnotic testimony. After a hearing on the motions, the trial court partially granted defendant's motions with regard to the witnesses, Carter and Myers, suppressing the post-hypnotic testimony and the identification of defendant by both witnesses. The trial court specifically stated:

> It should be noted that the Court does not, by its ruling, mean to exclude pre-hypnotic testimony, which to this Court has been properly recorded and preserved; nor should the Court's order excluding identification testimony be construed to be for any reason other than post-hypnosis.

Because § 547.200 provides only for an appeal by State, we do not consider the issue of whether the trial court correctly overruled that part of defendant's motion seeking suppression of the pre-hypnotic testimony of Myers and Carter.

■ State raises two points on appeal. In its first point, State contends that the trial court erred in sustaining defendant's motions to exclude post-hypnotic testimony and identification testimony by witnesses, Carter and Myers, on the basis of *Alsbach v. Bader*, 700 S.W.2d 823 (Mo. banc 1985).

State argues that the application of *Alsbach* to the facts of this case is overly broad, because *Alsbach* pertains only to cases where the challenged testimony is remembered *solely* as a result of the hypnosis. State factually distinguishes the instant action from *Alsbach* in that, prior to hypnosis, both witnesses furnished detailed descriptions of defendant; and that, during and after hypnosis, neither witness provided information which differed significantly from that originally given.

We decline to adopt the reading of *Alsbach* suggested by State. We are constrained to follow the dictates of the Supreme Court of Missouri as enunciated in *Alsbach*. In that case, after a thorough review of the approaches to hypnotically refreshed testimony used by other jurisdictions, the court adopted a per se exclusionary rule for hypnotically induced testimony. *Alsbach*, 700 S.W.2d at 827–830. The court opined:

> Hypnotically induced testimony in its current state does not meet the [*Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923)] and [*State v. Biddle*, 599 S.W.2d 182 (Mo. banc 1980)] standards of reliability and accuracy. It has not yet achieved the status of general acceptance in a relevant scientific community as a reliable means of restoring recollection. Although recognized to be a valid therapeutic technique, it cannot be said that hypnosis is recognized as a valid fact-finding tool.

*Id.* at 830.

We therefore hold that, in the instant action, the trial court correctly sustained in part defendant's motions to suppress post-hypnotic statements by witnesses, Carter and Myers, as well as the out-of-court and in-court identification of defendant by those two witnesses. State's first point is denied.

■ In its second point, State contends that the trial court erred in suppressing the identification testimony of witnesses, Carter and Myers, because the pre-trial procedures used guaranteed its reliability. Under *Alsbach*, the fact that the witnesses were hypnotized prior to identifying defendant in a lineup per se taints the identifications by those witnesses and makes their post-hypnotic statements unreliable. State's second point is denied.

The order of the trial court is affirmed.

SATZ and LIMBAUGH, JJ., concur.